PEOPLES BANK OF DANVILLE et al., Plaintiffs,

v.

Harold M. WILLIAMS, Chairman Securities Exchange Commission, et al., Defendants.

Civ. A. No. 78–0027(D).

United States District Court, W. D. Virginia, Danville Division.

March 24, 1978.

Jackson L. Kiser, Martinsville, Va., for plaintiffs.

John R. Kiefner, Jr., Regional Trial Counsel, Arlington, Va., Vernon I. Zvoleff, Sp. Counsel, Robert M. Fusfeld, Atty., Securities and Exchange Commission, Washington, D. C., Paul R. Thomson, Jr., U. S. Atty., Roanoke, Va., for defendants.

## OPINION

TURK, Chief Judge.

This is an action brought by three banks and five individuals who have been served with investigative subpoenas issued by defendant Securities Exchange Commissioners and their agents. Plaintiffs seek declaratory and injunctive relief to have the subpoenas quashed or greatly restricted in their scope. This court has jurisdiction over their claims under 28 U.S.C. § 1331(a). The case is before the court upon defendants' motion to dismiss for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

### I.

Although the facts relating to the formation of Peoples Bank of Danville are complex, the crucial events may be briefly recounted. In 1975, the Virginia Legislature amended § 6.1–231 of Va.Code Ann. (1977 Cumm.Supp.), which governs industrial loan associations. This new legislation required industrial loan associations to secure liability insurance coverage for all certificates of investment they issued. After July 1, 1975, industrial loan associations could not accept new deposits unless they were insured. A one-year grace period was allowed until July 1, 1976, however, if the association had filed an application for insurance before July 1, 1975.

In 1974, Peoples Industrial Loan Corporation (PILC) was a deposit-accepting industrial loan association located in Danville. Although it was prosperous, its continued existence after July 1, 1975, was threatened by the new Act because if it could not secure liability insurance its deposits would cease, effectively destroying it as a lending institution. Because of the difficulty anticipated in gaining insurance, the owners of the corporation decided to convert PILC into a bank. At that time PILC had 3,200 outstanding shares and 250 shareholders.

Initial attempts to gain a state bank charter and approval from the Federal Reserve Board (FED) were unsuccessful. PILC then employed a bank organizer and a second application was filed. At an October, 1975, meeting with representatives from the State Bureau of Banking and the FED, PILC representatives were informed it could not gain a charter and convert into a bank until several problems concerning financial structure and ownership were alleviated. One major problem was the lack of adequate working capital, and the PILC people were told it could not open as a bank until they had raised $1,000,000. The state and federal banking authorities subsequently issued an extensive letter outlining what PILC had to do in order to gain joint approval as a bank. The letter was specific and told PILC what steps it had to undertake to satisfy the banking regulators. PILC complied with these conditions. Bank examiners from both the state and federal agencies visited the institution to inspect its records and evaluate its procedures.

In order to secure the $1,000,000 required for status as a bank, PILC had to raise an additional $744,000. This was done by a public sale of stock. The corporation printed an offering circular and advertised for the sale of shares. When the sale had been completed, the state and federal authorities granted the institution a charter as a state bank and as a member of the Federal Reserve System. The 3,200 outstanding shares of PILC stock were exchanged for shares in the bank, and Peoples opened with total assets of $5,000,000. It now holds assets of $14,000,000 and has returned a 50¢ dividend on an initial investment of $8.00 per share. In short, Peoples Bank of Danville appears to be doing well as a new bank.

## II.

On January 31, 1978, defendant SEC Commissioners issued an order initiating a private investigation of the plaintiff Peoples Bank. This order authorized SEC representatives to issue subpoenas for testimony and for the production of documents and records. The order stated the following:

Members of the staff have reported information which tends to show that:

A. In connection with the offer, sale, and conversion of securities of Peoples Bank, Peoples Industrial Loan Corporation, and Peoples Services, Inc., conducted by Peoples Bank during 1976 and thereafter, certain of its officers, directors, and agents, and other persons, made to purchasers and prospective purchasers untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, concerning, among other things:

1. the offer and sale of Peoples Bank stock subsequent to the closing date of the offering;

2. the purchase of Peoples Bank stock by nominees and persons closely associated with the organizers, management and directors of Peoples Bank;

3. the financial condition of Peoples Industrial Loan Corp. ("PILC") and the nature of the assets and liabilities of PILC which Peoples Bank assumed;

4. the purchase of certain notes by Peoples Bank from banks associated with certain officers, directors and stockholders of Peoples Bank;

5. the circumstances surrounding the conversion of PILC into the Peoples Bank;

6. the extent to which certain persons and families would own or control, directly or indirectly, the stock of Peoples Bank;

7. the nature of the business operations and policies of Peoples Bank and its predecessor, PILC;

8. other representations, statements, and omissions of similar purport and object.

The Commissioners felt this information, gained without complaints from shareholders, was sufficient to indicate possible violations of the antifraud provisions of Section 17(a) of the Securities Act of 1933 and of Section 10(b) and Rule 10(b)–5 thereunder of the Securities Exchange Act of 1934 and, therefore, authorized an investigation. Acting under the authority granted by the Commission's order, an SEC representative issued subpoenas to plaintiffs. These subpoenas requested the production of documents and records, and in many cases required appearance of the persons for testimony. The subpoenas were to be returned in late February and early March, 1978. Plaintiffs filed suit February 24, 1978, seeking injunctive relief against the issuance of further subpoenas and to quash the existing subpoenas. An interim moratorium on the issuance of new requests was arranged until the court could rule upon the government's motion to dismiss and argument was held March 16, 1978, in this case. By that date, all the subpoenas were in default, and the SEC had filed a separate enforcement action.

### III.

Plaintiffs advance two arguments in support of their motion to quash the outstanding subpoenas. First, they argue the SEC has no jurisdiction, given the facts of this case, to inquire into the formation of the Peoples Bank of Danville for possible violation of the antifraud sections of the securities acts. If there is jurisdiction to subpoena documents and testimony, they next assert, the requests may be challenged as being arbitrary, burdensome and made in bad faith: they will subject the bank to undue damage in the eye of the public, thus damaging its reputation and financial stability.

Plaintiffs' jurisdictional argument is based upon the unique nature of the banking industry, an area heavily regulated by both state and federal laws.[1] Plaintiffs argument, briefly stated, is that this action precludes the SEC from attempting to enforce its antifraud laws unless there is evidence of a fraudulent transaction and resulting injury. In other words, Peoples National Bank of Danville has been thoroughly examined, approved and regulated by both Virginia and federal bank authorities and until the defendant SEC shows some indicia of fraud in the formation of the bank, and actual injury, it is barred in its inquiry by virtue of 12 U.S.C. § 484, which limits visitorial powers to the banking authorities. That section reads, in pertinent part: "No bank shall be subject to any visitorial powers other than such as are authorized by law . . . ."

Plaintiffs state the broad-ranging inquiry undertaken by the SEC, covering subject areas already examined in detail by both the Virginia and federal banking regulators, constitutes a form of visitorial powers prohibited by § 484. Plaintiffs argue the SEC may not exercise direct supervision over the bank because of § 484 and may not, by use of its antifraud provisions, accomplish the same result of visitation which is expressly prohibited by § 484 by another, although indirect, means.

This argument is based upon the familiar doctrine that where Congress has enacted two statutory schemes which arguably embrace the same subject matter, the more precise, detailed and narrow legislation should apply to the exclusion of the more general law. See, e. g., Brown v. GSA, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); Bulova Watch Co. v. United States, 365 U.S. 753, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961). Also, "where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." Morton v. Mancari, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290

1. See § 6.1-3 et seq., Va.Code Ann.; 12 U.S.C. § 321 et seq.

(1974). Plaintiffs claim the banking laws should be viewed as narrow, detailed, and specific and, therefore, entitled to precedence over the more general securities regulation laws. As evidence, they cite language from the recent decision in *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976). They rely, in part, upon the following passage:

The primary purpose of the Securities Exchange Act was not to regulate the activities of national banks as such but "[t]o provide fair and honest mechanisms for the pricing of securities [and] to assure that dealing in securities is fair and without undue preferences or advantages among investors. . . ." H.R.Rep. No. 94–229, p. 91 (1975).

426 U.S. at 155, 96 S.Ct. at 1994.

Plaintiffs find further support for their position in the following language from *Radzanower, supra:*

The Securities Exchange Act of 1934 covers a "subject" quite different from the National Bank Act. The 1934 Act was enacted primarily to halt securities fraud, not to regulate banks. Indeed, banks were specifically exempted from any provisions of the securities laws, and Congress almost contemporaneously enacted other specific legislation dealing with the problems arising from banks' involvement in the securities business. The passage of that legislation and the exemption of national banks from important provisions of the securities laws suggest, if anything, that Congress was reaffirming its view that national banks should be regulated separately by specific legislation applying only to them.

426 U.S. at 157, 96 S.Ct. at 1995.

Thus plaintiffs argue the banking laws, including § 484, are intended by Congress to be the sole law governing the normal operations of banks, and that absent evidence of actual fraud and resulting injury in a bank transaction, the SEC enjoys no jurisdiction to examined bank activities. Plaintiffs allege if the SEC were allowed to investigate banks in a far-reaching manner, that would constitute a visitorial power directly prohibited by § 484.

Plaintiffs assert the proper definition of fraud for the securities laws is that adopted in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). There, the court held violation of § 10(b) required allegation and proof of "*scienter*," i. e., intent to deceive, manipulate, or defraud on the part of defendant. *Id.* at 194–214, 96 S.Ct. 1375. Plaintiffs further allege in order to show fraud the SEC must show the bank induced a person to rely on material misstatements or misrepresentations and that the bank did so with the scienter required by *Ernst & Ernst, supra. See Wright v. Heizer Corp.*, 560 F.2d 236, 249 (7th Cir. 1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978).

Thus, according to plaintiffs' argument, the SEC has failed to carry its burden of demonstrating evidence of actual fraud in the creation of the Peoples Bank of Danville, and absent such proof it is precluded from further investigation of this bank—an entity which Congress intended to entrust to the banking authorities in all but cases where the SEC has established fraud, or at least "probable cause" to feel a securities violation has occurred.

IV.

Because plaintiffs rely on § 484 to establish the SEC lacks jurisdiction to investigate Peoples Bank, it is appropriate to begin by examining that statute. It reads:

*No bank shall be subject to any visitorial powers other than such as are authorized by law*, or vested in the courts of justice or such as shall be or shall have been exercised or directed by Congress, or by either House thereof or by any committee of Congress or of either House duly authorized.

(emphasis supplied).

Thus two issues are presented: first, whether the SEC investigation is a "visitorial power" within the contemplation of the statute, and if so, whether this SEC investigation is "authorized by law." This section

has not been discussed often and less than a dozen reported cases construe it. The first modern case to consider § 484 is *Bank of America National Trust & Savings Ass'n v. Douglas*, 70 App.D.C. 221, 105 F.2d 100 (1939). There the SEC, as part of an investigation of another company, subpoenaed records of the bank. One of its defenses to the request was that such examination constituted a violation of § 484. The court rejected this claim stating:

We are not holding that the Commission has any "visitorial" power over the Bank, or that it has the slightest right to manage or control the Bank's affairs to policy, or to do any of those things which are visitorial in character. If in the discharge of its duty to hold hearings and make findings business secrets are necessarily disclosed, the result is attributable only to the necessity of carrying out the purposes of the Act. The difference between this and the exercise of visitorial powers, which are restricted by Congress to itself and certain particular agencies of government, is pointed out in *First Nat. Bank of Youngstown v. Hughes, C. C.*, 6 F. 737, in this language: "Visitation, in law, is the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce an observance of its laws and regulations. Burrill defines the word to mean 'inspection; superintendence; direction; regulation.' The exercise of no such authority is contemplated by defendants. They do not contemplate inspection, supervision, or regulation of complainant's business, or an enforcement of its laws or regulations. On the contrary, their purpose is to ascertain, in a legal way, and by legitimate testimony, whether any person had, at the time mentioned, on deposit with complainant any money subject to taxation in said county which had not been returned by the owners thereof for that purpose. Hence, the subpoena commanding the production of the complainant's books, in the manner and for the purpose stated, is not an exercise of 'visitorial powers;' * * *."
Pages 740, 741.

70 App.D.C. at 226, 105 F.2d at 105–06.

In *National Labor Relations Board v. Northern Trust Co.*, 148 F.2d 24 (7th Cir.), *cert. denied*, 326 U.S. 731, 66 S.Ct. 38, 90 L.Ed. 435 (1945), the court considered whether NLRB subpoenas issued against a bank violated the terms of § 484. The court found they did not because the Board's investigation fell within the stated exception for visitorial powers authorized by law. 148 F.2d at 29. In *Bowles v. Shawano National Bank*, 151 F.2d 749 (7th Cir. 1945), *cert. denied*, 327 U.S. 781, 66 S.Ct. 680, 90 L.Ed. 1008 (1946) the court considered whether the Office of Price Administration could serve subpoenas on a bank in investigating price violations. The court found no violation of § 484 and said:

The Administrator, ex necessitate, needs investigatory powers both to promulgate rational orders and regulations, and to apprehend violations thereof. He cannot intelligently make charges without knowing facts to substantiate them. The accused would vigorously and justly protest against unfounded charges. How is the Administrator to unearth such violations or to confirm information given him by aggrieved persons or alert loyal citizens? By investigation and checking, of course.
151 F.2d at 751.

From these cases it becomes clear that under § 484 any inquiry into the operation of a bank is not automatically a "visitorial power" which is prohibited. The *Bank of America* case specifically rejected the claim that any duplication of efforts by agencies in supervision of a bank constituted prohibited visitation. 70 App.D.C. at 227, 105 F.2d at 106. Although *NLRB v. National Trust Co., supra* is the only case to find agency action visitorial in its nature, it also found the NLRB acted pursuant to a congressional mandate and therefore was within the statute's express exception. Thus plaintiff's claim of visitation must stand or fall based upon an examination of what the SEC intends to do by its investigation into the formation of Peoples Bank of Danville.

## V.

The formal SEC order of January 31, 1978, initiating the Peoples inquiry indicated the Commissioners were concerned with possible violations of the antifraud sections of the 1933 and 1934 acts. Specifically, the order noted the SEC was concerned about violation of Section 17(a) of the Securities Act and 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder. These statutes create liability for "any person" who violates the acts. It is clear that corporations and banks are considered "persons" within the contemplation of the acts. Although bank securities are exempt from coverage under the registration requirements, banks are not excused from compliance with the antifraud sections of the laws. The sole governmental agency charged with enforcing the antifraud sections against banks is the SEC. Although federal banking officials hold concurrent jurisdiction to enforce some of the securities laws, they cannot enforce these antifraud sections.

It is clear the SEC has the statutory power to issue subpoenas as part of its inquiry regarding the Peoples investigation. The remaining issue is whether the exercise of that power constitutes a prohibited visitation upon bank operations which is barred by § 484.

At the hearing of March 16, 1978, plaintiffs called officials of the State Bureau of Banking and the FED to testify regarding the formation of Peoples Bank of Danville. They stated SEC inquiry into the areas of concern noted in the formal order of January 31, 1978, would in substance duplicate the efforts they took when the bank was issued a charter. They stated although they were not legally charged with enforcing the federal securities laws that they would have called any violations to the attention of the bank officials if they had noted any. Although none of plaintiffs' witnesses would state their regulatory efforts would be pre-empted by SEC inspection in this, or in similar cases, they did note the agencies would overlap efforts in a case such as this, where the target of SEC inquiry was a bank.

The SEC argues that it does not seek to regulate, control, order or in any way exercise dominion over Peoples Bank of Danville, but that it only seeks to gain enough evidence to ascertain whether it should bring charges against the bank for violating the antifraud provisions of the acts. It claims no right to regulate Peoples in any fashion, but it vigorously asserts its right, as granted by Congress, to investigate for possible violation of the antifraud laws, regardless if the entity in question is a bank.

The court thinks the SEC inquiry is not a "visitorial power" within the understanding of § 484. *See Bank of America, supra.* The SEC does not seek to control Peoples in any fashion, it only desires to investigate for possible securities violations. Such an investigation is not, by itself, a prohibited visitorial power. *See Northern Trust Co., supra; Bowles, supra.*

## VI.

When a court is asked to appraise the legal sufficiency of a complaint by a motion to dismiss under Fed.R.Civ.P. 12(b)(6), it must take as true all allegations of fact contained therein and follow the settled rule that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hospital Building Corp. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Although this is a "concededly rigorous standard" *Hospital Building Corp., supra,* the court thinks it has been met and plaintiffs' first claim, relating to SEC jurisdiction, is hereby dismissed.

## VII.

Plaintiffs' second claim, regarding the scope and propriety of the outstanding subpoenas must also be dismissed. This is so for two reasons. The first is the practical reason that the SEC has filed an en-

forcement action in this court regarding the outstanding subpoenas and argument was heard in that case on March 16, 1978. The legal reason for dismissal is that plaintiffs have an adequate and available legal remedy open to them to challenge the subpoenas, thus no equity jurisdiction exists to hear their suit for declaratory and injunctive relief. *See Reisman v. Caplin*, 375 U.S. 440, 445–50, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). Plaintiffs may challenge the form, extent and scope of the subpoenas in the SEC enforcement action, thus plaintiffs have not been denied a determination of the merits of their cause, but only a ruling in the instant suit.

Accordingly, the second claim is hereby dismissed for failure to state a claim upon which relief can be granted.