INSURANCE COMMISSIONER OF THE STATE
OF MARYLAND *v.* BLUE SHIELD
OF MARYLAND, INC. ET AL.

\* \* \*

DONALD H. DEMBO *v.* INSURANCE COMMISSIONER
OF THE STATE OF MARYLAND

[No. 46, September Term, 1982.]

*Decided March 4, 1983.*

498

The cause was argued before SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ., and JAMES C. MORTON, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*James L. Shea, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Michael L. Cohen* and *Thomas P. Barbera, Assistant Attorneys General,* on the brief, for appellant Insurance Commissioner of the State of Maryland and by *Angus R. Everton,* with whom were *Anderson, Coe & King* on the brief, for cross-appellant Donald H. Dembo.

*Amicus curiae* brief of The Medical and Chirurgical Faculty of Maryland filed. *Angus R. Everton* and *Anderson, Coe & King* on the brief.

*William M. Hesson, Jr.,* with whom were *G. Scott Barhight* and *Nolan, Plumhoff & Williams, Chartered* on the brief, for appellee Blue Shield of Maryland, Inc. and by *Charles J. Steele,* with whom were *Anne G. Collins, Jacqueline M. Saue, Thomas F. Fitzgerald* and *Whiteford, Hart, Carmody & Wilson* on the brief, for appellee Medical Service of the District of Columbia and by *Michael L. Cohen, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, James L. Shea* and *Thomas P. Barbera, Assistant Attorneys General,* on the brief, for cross-appellee Insurance Commissioner of the State of Maryland.

RODOWSKY, J., delivered the opinion of the Court.

On December 31, 1981 the Insurance Commissioner of Maryland (Commissioner) adopted an order relating to reimbursements made by nonprofit health service plans for services by health care providers, other than hospitals, that is, by physicians, chiropodists, chiropractors, pharmacists, dentists, duly certified psychologists and optometrists. Two such plans, Blue Shield of Maryland, Inc. (Blue Shield) and Medical Service of the District of Columbia (MSDC), hereinafter collectively called the "Plans," or "Appellees," challenged that order by appeal to the Baltimore City Court (now the Circuit Court for Baltimore City).[1] That court held that the Commissioner exceeded his statutory authority in adopting the order and, in effect, completely vacated it. The Commissioner appealed to the Court of Special Appeals. We granted the Commissioner's petition for certiorari prior to consideration of the matter by the intermediate appellate

---

1. The appeal was pursuant to Md. Code (1957, 1979 Repl. Vol., 1982 Cum. Supp.), Art. 48A, § 361B, which incorporates the provisions of § 242B of that article.

court. For reasons hereinafter set forth, we shall affirm in part, reverse in part and vacate in part.

Our grant of certiorari also brought before us an appeal noted by Dr. Donald H. Dembo (Dembo) to the Court of Special Appeals from the circuit court's dismissal, for want of standing, of Dembo's appeal to the circuit court from the same order of the Commissioner. Dembo's standing will be considered in Part II of this opinion.

Central to the controversy is the method of health care provider reimbursement known as the "usual, customary and reasonable," or "UCR," method. Its principal use by the Plans is with group coverages. The goal of a nonprofit health service plan is to make available prepaid health services at a fixed cost during the policy period. This goal is accomplished by a plan entering into participation agreements with providers of health care under which the provider agrees to accept the amount paid by the plan for a given service as payment in full. Under policies where the payment to the provider is determined by the UCR method, a plan develops "profiles" for each covered service.[2] These profiles are of two types, "usual" and "customary." "Usual" profiles refer to a specific provider and are based on the fees charged by that provider for each type of service rendered by him and reported to the plan during a given period of time. The charge which the provider most frequently makes for a service is that provider's usual profile for that service. A "customary" or "community" profile is the composite of the usual profiles for a service. Each usual profile for a given service is weighted by the total number of claims reporting that service by the provider.[3] The usual profiles are then arrayed from low to high, and the level at which 90% of the claims would be paid in full becomes the customary profile for the service. Ordinarily, the amount paid by a plan for a particular service will be the lowest of the provider's sub-

---

2. "Service" as used in this opinion embraces surgical procedures.

3. Customary profiles are developed from fees charged for services by participating and by non-participating providers to the extent reflected in claims reported. If the provider has not entered into a participation agreement, the plan pays the amount of benefit to the plan's subscriber.

mitted charge, his usual profile, or the customary profile.[4]

Usual profiles and customary profiles have been periodically updated by the Plans. For example, profiles maintained by Blue Shield have been subject to updating on an annual basis utilizing a 30 month cycle. Claims submitted during a given calendar year form the data base for the updating. This data is analyzed during the first six months of the next succeeding calendar year, and the adjusted usual and customary profiles are put into effect July 1 of that year and remain in effect for a period of 12 months.

On July 22, October 9, November 9 and December 9 of 1981 the Commissioner, or his designee, conducted sessions of a hearing concerning the UCR method. The hearing was described by the Commissioner, or by members of his staff, at certain of the sessions as being quasi-legislative. A number of witnesses appeared and made statements. Documents and exhibits were presented by the Commissioner and by the witnesses. Cross-examination by representatives of the Plans was not permitted. There was substantial questioning by the Commissioner or by his presiding designee. A representative of MSDC attended the November 9 session at College Park and made a statement.

Review of the testimony and exhibits produced at the hearing is not particularly relevant to the legal issues presented on this appeal. In general, the subject was containment of the cost of physicians' services. The Commissioner filed in the record a number of published articles espousing the view that UCR reimbursement encouraged physicians to increase their charges and was inherently inflationary. A witness for Blue Shield expressed the opinion that such was not the case in Maryland. There was considerable discussion concerning the possible effects of reducing the percentile at which customary profiles were pegged. From one standpoint, such a reduction in plan operating costs might leave relatively undisturbed the broad

---

4. Plans also have a review procedure for claims requiring individual consideration based on the specific facts of the service.

availability of prepaid health care services while effecting reduced or stabilized premiums. On the other hand, many participating providers might exercise their right to terminate their participation agreements and thereafter charge plan subscribers without regard to the UCR limitations, so that an apparent stabilization or lowering of premiums would merely reflect a shifting to subscribers of the difference between the amount billed by the provider selected by a subscriber and the benefit payable by a plan.

The Commissioner issued a "notice and order," dated December 31, 1981, the material portions of which are set forth in full in the margin.[5] By its terms, it did the following:

------

5.

### NOTICE AND ORDER

TO    : All Nonprofit Health Service Plans in Maryland Operating Under Title 20 of the Insurance Code

FROM   : Insurance Commissioner Edward J. Birrane, Jr.

SUBJECT: Regulation of the "Usual, Customary and Reasonable" System of Physician Reimbursement

. . . .

After considering all of the testimony, and pursuant to the authority vested in the Insurance Commissioner under Sections 355 and 356 of Article 48A of the Annotated Code of Maryland, it is hereby ORDERED:

1. That this Order applies to all nonprofit health service plans (hereinafter referred to as Plans) operating under Title 20 of the Insurance Code which utilize the UCR system of physician reimbursement;

2. That the usual fee profiles for each physician which are maintained by the Plans are frozen at each profile's present level as of the date of this Order, for a period of time to end on July 1, 1982;

3. That the customary fee profiles of the community for particular medical services and surgical procedures which are maintained by the Plans are frozen at each profile's present level, unless and until the Plans receive approval of the Commissioner to increase such customary profiles;

4. That in the event a Plan desires to increase customary fee profiles, the Plan must seek and receive the approval of the Insurance Commissioner, in accordance with the law before effecting any such increase, which approval of the Insurance Commissioner will be granted only upon a showing by the Plan that the proposed increase in [sic] justified and necessary, in accordance with sound actuarial principles;

5. That request by Plans for approval of the Insurance Commissioner of proposed increases in customary fee profiles shall be filed on or before July 1 of each calendar year, beginning in 1982, and

Froze usual profiles until July 1, 1982 and froze customary profiles until any increase was approved by the Commissioner (¶¶ 2, 3 and 4);

Established a July 1 deadline for filing requests for increases in customary profiles (¶ 5);

Utilized any increase in certain economic indices as a ceiling on increases in customary profiles (¶ 6);

---

such filings shall be confidential and withheld from public inspection to the extent Maryland law permits;

6. That increases in the customary profiles, in the aggregate, if any, shall not exceed the increase in the Consumer Price Index, the physician's services component of the Consumer Price Index, or the Medicare Economic Index, whichever is lowest, on an annual basis, absent a showing of extraordinary cause, and no increase in the Consumer Price Index, the physician's services component of the Consumer Price Index or the Medicare Economic Index shall serve to create any presumption that increases in customary profiles are justified and necessary, but rather all increases must satisfy the requirements of Paragraph 4 herein;

7. That the computation of customary fee profiles shall exclude from its data base all usual fees charged by physicians during their initial three year period as private, practicing physicians;

8. That the customary fee profiles which were established at the inception of Plan C by Blue Shield and remain at the 90th percentile, which percentile was admitted by Blue Shield to be an arbitrary figure, of all charges for a particular procedure by community physicians participating in a Plan, be set at the 80th percentile of all such charges, effective July 1, 1982, unless good cause be shown before July 1, 1982 why such reduction would be unjustified and unnecessary or adverse to the public interest;

9. That the Plans must file on or before July 1, 1982, a study explaining how, if at all, the Insurance Commissioner, the Plans, or both may identify medical services and surgical procedures which become common so as to suggest a lowering of cost to be appropriate, and a study examining what, if any, dichotomy exists between the apparent availability if [sic] in-hospital benefits in comparison to the apparent non-availability of benefits for medical care rendered in a physician's office or in a patient's home, and a study of the feasibility, from a practical standpoint, of negotiated fee schedules between specific specialty groups and Blue Shield, the results of which negotiations would be subject to the approval of the Insurance Commissioner.

AS WITNESS MY HAND AND SEAL THIS 31 DAY OF DECEMBER, 1981.

INSURANCE COMMISSIONER

SEAL /s/ _____

Edward J. Birrane, Jr.

Ordered that fees charged by physicians during their initial three year period as private practicing physicians be excluded from the computation of the customary profiles and that customary profiles be set at the 80th percentile effective July 1, 1982 (¶¶ 7 and 8); and

Directed the Plans to submit certain studies (¶ 9).

In their legal analyses, the parties have approached the challenged order as action which stands or falls as a whole. At oral argument in this Court, the Commissioner placed principal reliance on a statutorily conferred "power of visitation" over the Plans. He also argued that his power to approve or reject rates charged to subscribers, or his power to approve or reject contracts between plans and providers, impliedly authorized the order. The reason for the absence of an argument based on a direct statutory authorization for the order in its entirety lies in the history of the somewhat unique statutes governing these plans.

Md. Code (1957, 1979 Repl. Vol., 1982 Cum. Supp.), Art. 48A, Title, "Insurance Code," subtitle 20, "Nonprofit Health Service Plans," §§ 354 through 361E is the applicable body of statutory law. No provision of the Insurance Code applies to nonprofit health service plans, "except as stated in subtitle 20." *See* § 9 (2).[6] Such plans are "governed and regulated by" subtitle 20 "and by no other law relating to insurance unless such law is referred to under" subtitle 20, or unless the other law specifically refers to such plans. § 354 (a).

Because the health service plans were originally like a consumer cooperative which arranged prepaid health care for its members with hospitals or physicians, some courts held that these plans were not subject to the statutes regulating insurance. *See* Annot., 167 A.L.R. 322, 323-26 (1947). Yet the plans were also like insurance, and if ruled

---

6. All Maryland statutory references are to the current Insurance Code, unless otherwise stated.

to be engaged in that business, would be subject to the general insurance law. Consequently, in the late 1930's, a number of states began to enact special laws on the subject. *See* Note, *The Legal Problems of Group Health,* 52 Harv. L. Rev. 809, 816 (1939); Note, *Group Health Plans: Some Legal and Economic Aspects,* 53 Yale L.J. 162, 173-74 (1943). New York was the first state to enact an enabling statute to permit the establishment of nonprofit hospital service corporations. See Rorem, *Enabling Legislation for Non-Profit Hospital Service Plans,* 6 Law & Contemp. Probs., 528, 529-31 (1939); N.Y. Insurance Law, §§ 452-461 (Cahill 1930, 1931-1935 Cum. Supp.). In Maryland, a public local law applicable to Allegany County and permitting the establishment of a nonprofit hospital service plan was enacted by Chapter 476 of the Acts of 1935. This public local law was repealed by the Acts of 1937, Chapter 224, which enacted the basic framework of present subtitle 20. When plans were authorized to be established for medical and dental services by Chapter 752 of the Acts of 1945, the basic 1937 law relating to hospital plans was simply expanded to include those additional professions.[7]

One consequence of this special statute is that the Commissioner's general rulemaking power under § 26 does not apply to subtitle 20.

I

A.

A further consequence of viewing the subject order within the confines of subtitle 20 is that the order is not an exercise of the Commissioner's power to approve rates to subscribers.

---

7. There was a general revision of the Insurance Code by Ch. 553 of the Acts of 1963. However, that revision made no changes of substance in subtitle 20, because Blue Cross plans were then under study by a Committee of the Legislative Council of the General Assembly. That committee seems not to have proposed any legislation. *See* Proposed Insurance Code For the State of Maryland and Report of the Governor's Commission to Study the General Insurance Laws of Maryland, at iii (1961); Legislative Council Committee on Blue Cross Insurance, Report to the Gen. Assembly of 1961, at 171-73 (1960).

Section 356 provides that a subtitle 20 plan shall not make any change "in the table of rates charged ... to subscribers ... until such proposed change has been submitted to, and approved by, the Insurance Commissioner." Under that section the "Commissioner shall disapprove or modify the proposed change or changes if the table of rates appears by reasonable assumptions to be excessive in relation to benefits ...." Here, neither Appellee has applied for a change in the table of rates, so that the Commissioner's power to disapprove or modify a proposed rate change has not been triggered. The Commissioner argues, perhaps more from the basis of his view of a desirable policy than from the language used by the General Assembly to confer the power, that his rate modifying power under § 356 is not passive, but that he may exercise it on his own initiative. We assume, *arguendo*, that the power is exerciseable in that manner.[8] Nevertheless, neither the December 31, 1981 order on its face, nor the record of the informational hearing, reflect that the table of rates was disapproved or modified by the order.[9]

The Commissioner cites two cases, each of which arose on applications by health service plans to increase rates, for the proposition that the rate approving function carries with it

---

**8.** Ch. 476 of the Acts of 1935, § 488D provided that "the rates charged by [a nonprofit hospital service plan in Allegany County] to the subscribers for hospital care shall *at all times* be subject to the approval of the State Insurance Commissioner ...." (Emphasis added.) The words "at all times" were not included in Ch. 224 of the Acts of 1937 and are not found in the present subtitle 20. Comparison may be made to § 242 relating to property, casualty, surety and marine insurance. There subsection (c-1) expressly provides that the "Commissioner is empowered at any time to require any automobile liability insurance rating organization and any insurer writing automobile liability insurance in this State to demonstrate to him that its rates and methods of setting rates for automobile liability insurance are in compliance with subsection (c) hereof, notwithstanding that the rates then in effect had previously been approved by the Commissioner."

**9.** We express no opinion on what constitutes the "table of rates" as used in § 356. At argument, counsel advised that the Insurance Division had approved a formula for the determination of the premium to be charged by Blue Shield under Plan C, its plan for group coverages, but that the Commissioner has not required filings of the premiums on specific Plan C policies. The dollar amount of premium charged on any particular group policy may vary from one policy period to another, depending upon factors including the extent of coverage, loss experience and group size. Within that framework, either the underlying formula or the dollar amount of premium might arguably be the "table of rates."

the power to examine costs of a plan, including reimbursements to providers. *See Thaler v. Stern,* 44 Misc. 2d 278, 253 N.Y.S.2d 622 (1964); *In re Rate Filing of Blue Cross Hospital Service,* 214 S.E.2d 339 (W. Va. 1975). The Attorney General of Maryland ruled substantially to the same effect in 1958 in connection with a request by Maryland Hospital Service, Inc. for "approval of changes of its rate structure and of its contracts with participating hospitals." 43 Op. Att'y Gen. 194. Blue Shield concedes that the Commissioner's power in a hearing on a request for a rate change embraces consideration of provider reimbursements. However, that power was not exercised in passing the subject order. The order does not approve, disapprove, or modify a requested, or even the existing, table of rates, as such.

The Commissioner's remaining contentions are based on his authority to review contract change requests and on the power of visitation. In our analysis, the order is not susceptible of consideration as a whole under either of these justifications. Our further review will follow the various parts of the order as outlined above.

B.

Paragraph 2 of the order froze usual profiles until July 1, 1982, but the entire December 31, 1981 order was stayed by the circuit court. Paragraph 2 has expired by its terms. Indeed, under the procedures of Blue Shield, no increase in usual profiles would have been made in ordinary course following December 31, 1981 until July 1, 1982. Any effect of that paragraph is now moot, and there has been no argument made that temporary freezes of usual profiles will be a recurring problem. On the other hand, paragraphs 3 and 4 involve a present controversy. By these paragraphs the Commissioner froze customary fee profiles until any increase was approved by him.

The "Blue Shield Participating Physician Agreement" has been included in the record. Under it a physician agrees, *inter alia:*

> 2. to accept, as full and final compensation for services rendered to subscribers ... the amount published in the Guide to Programs and Benefits, or any modification of it which may properly be made under the By-Laws of Blue Shield ....

This provision is said by Blue Shield to embrace its UCR method of reimbursement. MSDC's participating physician agreement contains a general description of the UCR method in the document signed by the physician. Each Appellee contends that approval in the past by the Commissioner of its participating physician agreement constituted approval of its UCR method of reimbursement. In the case of Blue Shield, the Commissioner's brief says that the UCR method was not submitted to the Insurance Division at the time that Plan's form of physician participation agreement was presented for approval. The record is silent on that point. However, the Commissioner does not argue that the UCR method as presently utilized by Blue Shield is illegal for the lack of its ever having been approved. In this posture of the case, we consider both Plans' present methods of computing customary profiles to have been approved as part of the approval of the participation agreements.

Nevertheless, the Commissioner's position is that his December 31, 1981 order is supported by § 356's requirement for his approval of amendments to participation agreements. With respect to such contracts, that section in relevant part reads:

> No corporation subject to the provisions of [subtitle 20] shall amend ... the terms and provisions of contracts executed or to be executed with hospitals, physicians, chiropodists, chiropractors, pharmacists, dentists, psychologists, or optometrists ... until such proposed amendments have been first submitted to, and approved by, the Insurance Commissioner .... Each amendment shall be on file for a waiting period of 45 working days before it becomes effective. When in the Commissioner's opinion an amendment is not accompanied by the

information needed to support it and the Commissioner does not have sufficient information to determine whether the filing meets the requirements of this section, the nonprofit health service plan shall be required to furnish the needed information and in this event the waiting period shall be suspended and shall recommence as of the date the information is furnished. Upon written application by the nonprofit health service plan, the Commissioner may authorize an amendment which he has reviewed to become effective before the expiration of the waiting period or any extension thereof or at any later date. A filing shall be deemed approved unless disapproved by the Commissioner within the waiting period or any extension thereof. The Commissioner shall disapprove or modify the proposed change or changes ... if the form contains provisions which are unjust, unfair, inequitable, inadequate, misleading, deceptive, or encourage misrepresentations of the coverage. In determining whether to disapprove or modify the form ... the Commissioner shall give due consideration to past and prospective loss experience within and outside this State, to underwriting practice and judgment to the extent appropriate, to a reasonable margin for reserve needs, to past and prospective expenses both countrywide and those specifically applicable to this State, and to all other relevant factors within and outside this State.

When a plan analyzes reported fee data, it may reflect that a given customary profile should or should not be increased under the present method. The method of determining a customary profile from time to time is a provision of the participation agreements; otherwise, it could not have been initially approved. The dollar amount of a customary profile in effect at any given time is also a part of a participation agreement. It is a limit on what the participating provider agrees to accept as payment in full. Section 356 requires Commissioner approval of an amendment to participation

agreements. Changes either in the method of computing customary profiles or in the amount of a customary profile necessarily amend the agreement between the plan and a provider.

In paragraphs 3 and 4 of his order, the Commissioner is, in effect, announcing that he intends to enforce the literal language of § 356 as to changes in amounts of customary profiles. This seems to be without regard to whatever the prior enforcement policy of the Insurance Division might have been. Because each change in the amount of a customary profile is an amendment of a provision of the contract with the provider within the meaning of § 356, paragraphs 3 and 4 are valid. The Commissioner can direct insurers to comply with the statutes applicable to their business.[10]

Paragraphs 3 and 4 of the order do not, of themselves, undertake to change any existing contracts between Appellees and participating providers. Those paragraphs of the order operate only when the parties effect a change of terms in the manner provided by their agreement. Participation agreement amendments have been subject to approval by the Commissioner ever since health service plans have been the subject of special regulation. Accordingly, paragraphs 3 and 4 of the order do not present either an impairment of contractual obligation or a violation of due process.

Appellees also argue that the challenged order violates their rights to equal protection because it does not apply to commercial insurers who might also be utilizing UCR reimbursement. Insofar as paragraphs 3 and 4 of the order

---

**10.** At the December 9, 1981 session of the Commissioner's informational hearings, the principal staff economist in the health care area with the Federal Trade Commission's Bureau of Economics traced the history of the UCR system. UCR was introduced experimentally in Wisconsin in 1954 by a physicians' service plan. A number of physician service plans and a few commercial insurers used the system in the early 1960's. The commencement of the Medicare program in 1966, which adopted a UCR type of payment mechanism, gave added impetus to the acceptance of UCR. Section 356 was drafted in an era when physician reimbursement usually was a contractually provided lump sum for a contractually scheduled service. However, we cannot partially repeal the statute by carving UCR plans out of the statute's plain language.

are concerned, they are valid because § 356 requires that changes proposed by a plan in its participation agreements be submitted for Commissioner approval. On the record before us, the use of participation agreements is unique to nonprofit health service plans. It is the Plans' use and amendment of participation agreements, and not their use of UCR reimbursement, that is the nexus between § 356 and paragraphs 3 and 4. The Commissioner's order does not offend equal protection by not including a direction to commercial insurers to submit for approval changes in a type of agreement which commercial insurers do not utilize.

MSDC advances a special argument based on that Plan's multi-state operations. As MSDC now operates, all fees for a particular service, whether originating in Maryland, the District of Columbia or Virginia, are included in MSDC's data base for determining its customary profile for a given service. It is argued that the order is unconstitutionally vague because MSDC cannot determine from the order which fees are frozen for the purpose of determining the usual and customary profiles. MSDC says it cannot determine whether the governing criterion is the residence of the patient, the place where the service is rendered, the place from which the service is billed or the fact that the physician may maintain an office in Maryland, even if that is not the situs of the service.

We are concerned only with paragraphs 3 and 4 of the order.[11] Once our mandate issues, the customary profiles then in effect will not be subject to increase without the Commissioner's approval. MSDC has determined those profiles. Even assuming that the vagueness doctrine, which is ordinarily applicable only in criminal cases, is applicable here, there is nothing vague about the subject of what is "frozen."

Essentially, MSDC's argument about vagueness goes to the extent to which it may continue to operate in the future in the manner in which it now operates. By issuing health

---

11. We shall hold, *infra*, that paragraphs 7 and 8, to which MSDC's instant argument also applies, are invalid on other grounds.

policies in this state covering Maryland subscribers, MSDC is required to be licensed in Maryland. § 355 (a).[12] So far as the record and briefs inform us, it appears that the customary profiles developed by MSDC are uniform throughout its tri-jurisdictional market area. Whether MSDC may compartmentalize its operations and establish increased customary profiles for a portion of its business which may be beyond the reach of Maryland law is a question which is not before us. That phase of MSDC's vagueness argument is really a request for an advisory opinion which we decline to give.

MSDC also claims that the order is void, as to it, for lack of notice. However, MSDC appeared at the College Park session of the informational hearing and spoke in opposition to any change being ordered in the method of computing customary profiles. We have already held that present Maryland statutes confer the power on the Commissioner to approve changes in participation agreements and that that power applies to changes in a Plan's customary profiles. To the extent, if any, that notice was required of the Commissioner's announced intent to enforce § 356 at the level of detail of customary profiles, MSDC's actual notice satisfied the requirement.

Blue Shield also submits that it was denied procedural due process because it was not allowed to cross-examine at the informational hearing. No statute sets forth the procedure to be followed by the Commissioner preliminary to issuing a "notice and order" of the subject type, so that Blue Shield's argument must reach constitutional dimensions. But paragraphs 3 and 4 do no more than announce that the existing statute is to be followed if customary profiles are to be changed. Any facts developed at the informational hearing were legislative facts and cross-examination was not required. See *Montgomery Co. v. Woodward & Lothrop,* 280 Md. 686, 376 A.2d 483 (1977), *cert. denied,* 434 U.S. 1067, 98 S. Ct. 1245, 55 L. Ed. 2d 769 (1978).

---

12. By this statement we intend only to illustrate a clear basis for Maryland's exercise of power over MSDC without defining the limits of that power.

C.

We interpret paragraph 5 of the order to mean that the Commissioner proposes to batch requests for approval of increases in customary profiles, whenever the requests happen to be filed with him, and not act on them until after July 1 of any year. That procedure conflicts with § 356 under which requests for approval may be made at any time and are ordinarily to be acted upon within 45 days after filing. Paragraph 5 is void.

D.

The sixth paragraph of the order announces standards or guidelines which the Commissioner proposes to follow in reviewing requests for increases in customary profiles. This case does not involve a requested increase in customary profiles. No record is before us directed to comparing a specific, requested increase with the standards for changes in a participation agreement set forth in § 356. We cannot say in the abstract whether the economic indices referred to in paragraph 6 of the order would furnish substantial evidence to support a finding by the Commissioner that the standards in § 356 for review of provider contract terms have, or have not, been met. This phase of the instant matter is premature and does not present a justiciable issue. *See Hughes v. Schaefer,* 294 Md. 653, 666-67, 452 A.2d 428, 435 (1982).

E.

The seventh and eighth paragraphs of the order purport to operate on, and change, the method of computing customary profiles under existing contracts with providers, even if a plan does not seek to increase the customary profile. New physicians' fees are to be excluded for three years from the computation, and customary profiles are to be set at the 80th percentile, in lieu of the present 90th percentile. The Commissioner's power under § 356 to approve proposed changes

in contracts does not embrace the power to compel changes to be made in existing and approved contracts. Accordingly, we turn to the Commissioner's argument based on the power of visitation language in § 358. Section 358 reads:

> The Commissioner, or any examiner or examiners of the Insurance Department, shall have the power of visitation and examination into the affairs of any such corporation and free access to all of its books, papers and documents, and may summon and examine under oath its officers, agents, or employees, or other persons, in relation to the affairs, transactions and conditions of the corporation. The corporation whose affairs are examined shall pay the expenses of examination as provided in § 33 of this article.

Appellees contend that § 358's reference to a power of visitation cannot support the subject order because the power is also conferred on examiners. This is said to indicate that the power is only investigative. Because subtitle 20 is basically self-contained, Appellees see the power of visitation in § 358 as authority to investigate for violations of the provisions of subtitle 20 with any administrative or other redress, in the event such a violation exists, lying under powers conferred in subtitle 20.[13] Appellees conclude that, because they are not in violation of subtitle 20, the order exceeds the lawful exercise of the power of visitation.

For purposes of the issue at hand, we need not determine the full import of the conferral of a "power of visitation" under § 358. The issue is whether the term "visitation" embraces the power to order the Plans to change the present method of computing profiles, even though that method does not violate subtitle 20.

---

**13.** Appellees cite to § 354C (enumerating certain unlawful acts and providing penalties therefor); § 360 (relating to license revocation and subsequent rehabilitation and liquidation); § 361 (criminal penalties) and § 361A (rehabilitation and liquidation).

516

A good statement condensing the history of the concept of visitation is found in *Mayer v. Oxidation Products Co.,* 110 N.J. Eq. 141, 143-44, 159 A. 377, 377-78 (1932). It reads:

The concept of visitorial (or visitatorial) power was derived from the canon law and was extensively applied in the eighteenth century as a part of the common law, to charitable corporations, and especially to colleges. As so applied, visitorial power may be defined as the exclusive right of the founder of a corporation, his heirs or nominees, to make by-laws for the corporation and to adjudge disputes arising thereunder. The original endower of the corporation was considered to be the founder. If the king endowed, he was the founder and had the right of visitation, which he exercised through the chancellor as his visitor. But this authority of the chancellor was not a part of the jurisdiction which he exercised in the court of chancery; it was one of his ministerial powers. *3 Bl. Com. 47; Attorney-General v. Earl of Clarendon, 17 Ves. Jr. 491; 34 Eng. Rep. 190.* The visitor was not the proper judge in all disputes among members of the corporation or relating to its internal affairs, but only in cases arising under its by-laws; controversies under the general law of the land were adjudicated in the public courts . . . . In the early days when a charity was created, the beneficiaries usually composed the corporation, for example the master and fellows of a college; but during the last two centuries the custom has arisen of incorporating trustees, who do not personally share in the revenue. In such case, by implication, the trustees are the visitors. Now, I much doubt if any of this doctrine has ever been the law in our country. The private endower of an incorporated charity has no visitorial power; the state seems to have the same power in respect to corporations endowed privately and those endowed by the state, except as its power in respect to the

former may be restricted by the doctrine of the *Dartmouth College Case.* The authority of trustees is determined by the charter of the corporation or by the law of trusts and not by any rule concerning visitors.

Blackstone says that corporations other than charitable, namely, municipalities, trading companies, &c., were subject to the visitation of the king in the court of king's bench according to the rules of the common law. And in our country it has been laid down that the legislature is visitor of all corporations. I confess that this has, for me, little meaning; I have found no decision of which I could say that it was a case of the exercise of visitorial power over a civil corporation.

Most of the opinions of this Court in which reference has been made to visitation by a superintending authority are in a line of cases arising under the public school laws. That line traces back to *Wiley v. School Commissioners,* 51 Md. 401 (1879), in which the statutory powers of the State Board of Education were discussed. That board could make by-laws for the administration of the public school system, could suspend or remove teachers, and could " 'explain the true intent and meaning of the [public school] law, and . . . decide . . . all controversies and disputes that may arise under it.' " *Id.* at 406. This Court described such legislatively conferred powers as "a visitatorial power of the most comprehensive character" and said that "it has been settled ever since the great case of *[Philips] v. Bury,* 2 Term, 346 that such power is, in its nature, summary and exclusive." *Id.* This description of the State Board of Education's powers as "visitatorial" and "most comprehensive" has been frequently repeated.[14] But while the Commissioner relies on this line of

---

**14.** Among the more recent cases, *see, e.g.,* Resetar v. State Board of Education, 284 Md. 537, 556, 399 A.2d 225, 235, *cert. denied,* 444 U.S. 838, 100 S. Ct. 74, 62 L. Ed. 2d 49 (1979); Zeitschel v. Board of Education, 274 Md. 69, 80, 332 A.2d 906, 912 (1975); Halsey v. Board of Education, 273 Md. 566, 571, 331 A.2d 306, 309 (1975); Wilson v. Board of Education, 234 Md. 561, 565, 200 A.2d 67, 69 (1964).

cases, it is of very little assistance in interpreting § 358. The State Board of Education's powers were, and are, spelled out in the statute. They do not rest on giving a meaning to the word "visitation." *Wiley*'s characterizing that educational body's express powers as visitatorial "of the most comprehensive character" recognizes that there may be degrees of visitatorial powers. Much the same may be said with respect to the Commissioner's argument by analogy to the visitatorial power over court clerks conferred on "the Judges of their respective Courts" by Maryland Const., Art. IV, § 10, which was involved in *Peter v. Prettyman,* 62 Md. 566 (1884). That section also provides that "it shall be the duty of the Judges . . . to make . . . such rules and regulations as may be necessary and proper for the government of said Clerks, and for the performance of the duties of their offices . . . ." The import of a power of visitation, standing alone, cannot be gleaned from the judge-court clerk analogy.

So far as the briefs of the parties and our own research reflect, the last and only express reference by this Court to visitation powers over a corporation was in 1838. *Regents of the University of Maryland v. Williams,* 9 G. & J. 365.[15] In holding that the corporation's legislative charter was unconstitutionally impaired by a later state takeover statute, Chief Judge Buchanan wrote for the Court *(id.* at 401):

> Public corporations are to be governed according to the laws of the land, and the government has the sole right, as trustee of the public interest, to inspect, regulate, control, and direct the corporation, its funds and franchises. That is of the essence of a public corporation. But it has no such right in relation to eleemosynary corporations, or the management of their affairs. That belongs to the

---

**15.** The case dealt with a corporation which antedated the present state university. Background of *The Regents' Case* may be found in G. Callcott, *A History of the University of Maryland,* pp. 47-76 (Md. Historical Society, 1966).

visitors alone, under the visitatorial power incident to such corporations. *Angell and Ames on Corp.* 410; 2 *Kyd on Corp.* 174; 2 *Kent's Com.* 299, 300; *[Philips]* vs. *Bury,* 1 *L. Raymond, in* 2 *Term Rep.* 346, *&c. &c.* And where trustees or governors are incorporated to manage the charity, the visitatorial power is deemed to belong to them in their corporate character. 4 *Wheat Rep.* 675; *Story J. [Philips]* vs. *Bury,* 1 *L. Ray. in* 2 *Term R.* 346; *Ang. and Ames,* 412; 2 *Kent's Com.* 301.

The Regents of this University are made the visitors by the terms of the Act of 1812, the 11th section of which authorizes them to "vacate the seat of the provost or any of the professors," and requires them to meet in annual and other stated meetings, "in order to examine into all matters touching the discipline of the institution, and the good and wholesome execution of their laws." And all the authorities agree that colleges and academies established for the promotion of learning and piety, and endowed with property by public and private donations, are, in a legal sense, equally with hospitals for the relief of the poor, sick, &c. considered and treated as private eleemosynary corporations.

The foregoing discussion indicates that the scope of the power of a visitor over a corporation may be found in the terms of the instrument creating the position of visitor. That unremarkable proposition does not, however, inform us as to the scope of an unexplicated power of visitation statutorily conferred on a public official over a nonprofit corporation. But the limited Maryland authority does make plain that "visitation" has no fixed meaning, at least in this state.

Both *Wiley, supra,* and *The Regents Case, supra,* cited to *Philips v. Bury,* 2 Term 346 in discussing visitation. That case involved Exeter College in Oxford.[16] There Lord Holt

---

16. Walter Stapleton, a bishop of Exeter, was founder of the college which had been incorporated by letters patent from Elizabeth I. The visitor was the founder and his respective successors, as bishops of Exeter. A dispute

answered his rhetorical question, "What is the visitor to do?", by stating, "He is to judge according to the statutes and rules of the college." *Id.* at 353. "[T]he visitor is to inquire into the state of the college, and each one's particular behaviour and conformity to the college statutes . . . ." *Id.* at 357. "Statutes," as used in *Philips v. Bury,* mean the institution's governing rules as established by the founder. These may be equated with the charter and by-laws of a modern, nonprofit, membership corporation.[17]

Interpretation by a visitor of the intent of the founder's "statutes" is not the same as a visitor changing the "statutes." In *St. John's College v. Todington,* 1 Burr. *158 (1757) Lord Mansfield, in announcing the principal judgment, is reported as expressing extreme doubt whether a visitor can alter statutes, or give new laws, where the body of statutes has been given by the founder. *Id.* at *201. In terms of the present case, this suggests that the visitation power of the Insurance Commissioner would not include the power to require alteration of the method of computing customary profiles from that established pursuant to Appellees' respective charters and by-laws and in conformity with the applicable insurance statutes.

There is little wonder that the Third Circuit, in 1980, said that "[i]t is not clear just what 'visitorial' powers include, although generally they do encompass examination of the bank's books and records." *National State Bank, Elizabeth,*

_____

had arisen over the rights to possess the rector's cottage at the college. That dispute led to trial at King's Bench of an action of ejectment in which the plaintiff's claim of right rested on a determination by the visitor. Judgment for the defendant was reversed by the House of Lords. At the trial court level three puisne judges ruled for the defendant, while Lord Holt would have given judgment for the plaintiff. Report of the case at King's Bench, 1 L. Raymond 5 (1694) also reports reversal by the House of Lords, but does not state the reasons. Those reasons presumably are the ones given by Lord Holt. Holt's personal manuscript of his judgment (opinion) is reported in 2 Term 346 (1788).

17. This use of the term, "statutes," is also found in Trustees of Andover Theological Seminary v. Visitors of the Theological Institution in Phillips Academy in Andover, 253 Mass. 256, 148 N.E. 900 (1925), where the visitors of the Theological Institution in Phillips Academy prevailed in their conclusion that that institution's affiliation with Harvard Divinity School, as proposed by the directors (trustees), violated the intent of the founding statutes.

*N.J. v. Long,* 630 F.2d 981, 989. This case involved a section of the Federal Reserve Act, 12 U.S.C. § 484, which provided that no bank is subject to "visitorial" powers, other than as authorized by law. That statute, and its predecessor in the National Bank Act of 1864, Act of June 3, 1864, ch. 106, § 54, 13 Stat. 99, have given rise to a line of cases in which there is repeated a definition of "visitation" initially appearing in *First National Bank of Youngstown v. Hughes,* 6 F. 737, 740-41 (C.C.N.D. Ohio 1881):

> Visitation, in law, is the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, *and [to] enforce an observance of its laws and regulations.* Burrill defines the word to mean "inspection; superintendence; direction; regulation." [Emphasis added.]

*See, e.g., Guthrie v. Harkness,* 199 U.S. 148, 157-59, 26 S. Ct. 4, 7-8, 50 L. Ed. 130, 133-34 (1905); *Bank of America Nat. Trust & Savings Ass'n v. Douglas,* 105 F.2d 100 (D.C. Cir. 1939); *Peoples Bank of Danville v. Williams,* 449 F. Supp. 254, 259 (W.D. Va. 1978) (quoting *Bank of America, supra); Lord v. First National Bank of St. Paul,* 313 N.W.2d 390, 393 (Minn. 1981), *appeal dismissed,* 456 U.S. 967, 102 S. Ct. 2226, 72 L. Ed. 2d 840 (1982); *State v. First National Bank of Portland,* 61 Or. 551, 559-60, 123 P. 712, 715 (1912).

Another explanation of visitatorial power, and one somewhat broader than that found in the federal banking law cases, was given by the Supreme Court of Wisconsin in an action where mandamus was used to try the validity of a by-law of a private corporation. In *State ex rel. Cuppel v. Milwaukee Chamber of Commerce,* 47 Wis. 670, 679-80, 3 N.W. 760, 763-64 (1879) that court stated:

> The visitorial or superintending power of the state over corporations created by the legislature will always be exercised, in proper cases, through the medium of the courts of the state, *to keep those corporations within the limits of their lawful*

> *powers, and to correct and punish abuses of their franchises.* To this end the courts will issue writs of *quo warranto, mandamus* or injunction, as the exigencies of the particular case may require; will inquire into the grievance complained of, and, if the same is found to exist, will apply such remedy as the law prescribes. [Emphasis added.]

And *compare People v. Reed,* 66 Misc. 425, 123 N.Y.S. 305 (1910) (provision of insurance statutes authorizing superintendent of insurance to visit and inspect fraternal societies said to include whether a fraternal had violated its charter or the laws), *with Illinois Hospital Service v. Gerber,* 18 Ill. 2d 531, 535, 165 N.E.2d 279, 282 (1960) (purpose of provision of Illinois Non-Profit Hospital Service Plan Act giving Director of Insurance " 'the power of visitation and examination' " is "to confer upon him the authority to require compliance with the statute . . . .").

Three succeeding generations of American corporation law texts are in basic accord as to the scope of visitation over corporations. 2 T. Waterman, *Law of Corporations,* § 350, at 668 (1888) says that the "State has visitorial authority to interfere to ascertain whether or not the course pursued by a civil corporation is in excess of corporate power. This authority is asserted through the instrumentality of the courts. . . ." Joseph France writes in his *Principles of Corporation Law* § 12, at 13 (2nd ed. 1914), that "[t]he old power of visitation survives only in the modern and more limited right of the State and its courts to interfere in cases of abuse or misuse of the charter." (Footnote omitted.) And according to W. Fletcher, *Private Corporations* § 8425, at 362 (Perm. Ed. 1977), "[i]n general terms the right of visitation, as that term is now used in the United States, is the public right, existing in the state, to examine into the conduct and affairs of a corporation with the view of keeping it within its legal powers." (Footnote omitted).

We conclude that paragraphs 7 and 8 of the Commissioner's order are not supported by the power of visitation. We find no indication that a public official, statutorily desig-

nated as the visitor of a nonprofit corporation, is by that designation empowered to compel a change in procedures which in themselves are not violative of public law or of the charter and by-laws of the corporation. Consequently, paragraphs 7 and 8 of the order would have to find support in an authority of the Commissioner to promulgate a legislative rule, having the force and effect of law, and binding future conduct, that would render continued use of the existing procedure illegal. As explained above, the Commissioner has no legislative rulemaking authority over subtitle 20 corporations. We hold paragraphs 7 and 8 of the order to be invalid.

### F.

The ninth paragraph of the Commissioner's order requires the Appellees to submit certain information. Under the power to visit and examine the Plans which is conferred by § 358, the Commissioner or his designee could conduct a review of the records of the Plans in order to obtain directly the same information. This could be done at the cost and expense of the Plans. § 358. The Commissioner has not exceeded his authority in directing the Plans to furnish the data.

### G.

To sum up on Part I of these appeals, the effect of the Commissioner's past approval of participation agreements containing the UCR method of reimbursement does not mean that changes in the amount of customary profiles which result from the application of that method can be effected from time to time, indefinitely, without the Commissioner's approval. The Commissioner cannot directly order a change in existing participation contracts, including a change in the UCR method of computing reimbursement or in the amount of a customary profile, absent a change in the contract initiated by a Plan. In the past, the Commissioner in effect has approved changes in the contract terms

setting customary profiles, as they resulted from applying the UCR method. Nevertheless, the Commissioner has now declared that he will utilize the power, which we have concluded he has under § 356, to review changes in contract terms when the change is in the amount of a customary profile.

## II

We now consider Dembo's appeal from the dismissal by the circuit court of the appeal noted by him from the Commissioner's order. His appeal papers allege that he is a physician who practices in Maryland and that he is a participating physician in Plan C of Blue Shield. He avers that the "Commissioner's attempt to freeze and otherwise to regulate payments made to [him] by Blue Shield [has] a direct and adverse effect on his pecuniary interests . . . ."

Dembo did not testify or file a written statement in the informational hearing which preceded entry of the Commissioner's order. There is no indication that, prior to the order, he in any way indicated to the Commissioner that he was a person who claimed an interest in the subject under consideration. When the order was entered he simply noted an appeal from it under § 361B. Dembo did not seek to intervene in the appeals noted by Blue Shield and by MSDC which are insurers of the class to which the order was directed. Thus, Dembo's position rests solely on a claimed right to invoke the administrative appeal procedure of § 361B under the facts of his case.

Section 361B incorporates § 242B. Subsection (2) of the latter section, in material part, provides that "[a]ll orders or decisions of the Commissioner shall be subject to review by appeal to the Circuit Court for Baltimore City," and that the "Commissioner shall be made a party to every such appeal." Section 242B is silent as to who may take such an appeal. However, this conferral of the right of appeal is constrained by the general principle of administrative law that the person invoking the administrative appeal procedure must in

some way have been a party in the proceedings leading to the challenged agency action. *See Montgomery County v. One Park North,* 275 Md. 193, 338 A.2d 892 (1975) (even if aggrieved by agency order granting sewage hookup permission to developer, county had no standing to appeal where it had not been a party to agency proceeding); *cf. Morris v. Howard Research & Development Corp.,* 278 Md. 417, 423, 365 A.2d 34, 37 (1976) (absent a reasonable procedural regulation, "anyone clearly identifying himself to the agency for the record as having an interest in the outcome of the matter being considered by that agency, thereby becomes a party to the proceedings."). Dembo did not meet even these minimal requirements. The judgment of dismissal is affirmed.

> *In the appeal by the Insurance Commissioner: the appeal as to paragraph 2 of the order of December 31, 1981 is dismissed as moot; judgment of the Circuit Court for Baltimore City as to paragraphs 3, 4 and 9 of said order is reversed; judgment as to paragraph 6 of said order is vacated and the appeal as to paragraph 6 is remanded to the Circuit Court for Baltimore City with instruction to dismiss the appeal as to that paragraph; as to paragraphs 5, 7 and 8 of the order, the judgment is affirmed.*
>
> *Costs to be paid 50% by the Insurance Commissioner, 25% by Blue Shield of Maryland, Inc. and 25% by Medical Service of the District of Columbia.*
>
> *In the appeal by Donald H. Dembo: judgment of the Circuit Court for Baltimore City is affirmed.*
>
> *Costs to be paid by Donald H. Dembo.*