(Slip Opinion)     OCTOBER  TERM,  2008                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CUOMO, ATTORNEY GENERAL OF NEW YORK *v.* CLEARING HOUSE ASSOCIATION, L. L. C., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 08–453.   Argued April 28, 2009—Decided June 29, 2009

To determine whether various national banks had violated New York's
fair-lending laws, the State's Attorney General, whose successor in
office is the petitioner here, sent them letters in 2005 requesting "in
lieu of subpoena" that they provide certain nonpublic information
about their lending practices.  Respondents, the federal Office of the
Comptroller of the Currency (Comptroller or OCC) and a banking
trade group, brought suit to enjoin the information request, claiming
that the Comptroller's regulation promulgated under the National
Bank Act (NBA) prohibits that form of state law enforcement against
national banks.  The District Court entered an injunction prohibiting
the Attorney General from enforcing state fair-lending laws through
demands for records or judicial proceedings.  The Second Circuit af-
firmed.

*Held:* The Comptroller's regulation purporting to pre-empt state law
enforcement is not a reasonable interpretation of the NBA.  Pp. 2–15.

  (a) Evidence from the time of the NBA's enactment, this Court's
cases, and application of normal construction principles make clear
that the NBA does not prohibit ordinary enforcement of state law.
Pp. 2–11.

   (i) The NBA provides: "No national bank shall be subject to any
visitorial powers except as authorized by Federal law, vested in the
courts . . . , or . . . directed by Congress."  12 U. S. C. §484(a).  Among
other things, the Comptroller's regulation implementing §484(a) for-
bids States to "exercise visitorial powers with respect to national
banks, such as conducting examinations, inspecting or requiring the
production of books or records," or, as here pertinent, "prosecuting
enforcement actions" "except in limited circumstances authorized by

federal law." 12 CFR §7.4000(a)(1). There is some ambiguity in the NBA's term "visitorial powers," and the Comptroller can give authoritative meaning to the term within the bounds of that uncertainty. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837. However, the presence of some uncertainty does not expand *Chevron* deference to cover virtually any interpretation of the NBA. Pp. 2–3.

(ii) When the NBA was enacted in 1864, scholars and courts understood "visitation" to refer to the sovereign's supervisory power over the manner in which corporations conducted business, see, *e.g., Guthrie* v. *Harkness*, 199 U. S. 148, 157. That power allowed the States to use the prerogative writs to exercise control if a corporation abused its lawful power, acted adversely to the public, or created a nuisance. Pp. 3–4.

(iii) This Court's consistent teaching, both before and after the NBA's enactment, is that a sovereign's "visitorial powers" and its power to enforce the law are two different things. See, *e.g., Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 676, 681; *Guthrie, supra,* at 159, 157; *First Nat. Bank in St. Louis* v. *Missouri*, 263 U. S. 640, 660. *Watters* v. *Wachovia Bank, N. A.*, 550 U. S. 1, 21, distinguished. And contrary to the Comptroller's regulation, the NBA pre-empts only the former. Pp. 4–7.

(iv) The regulation's consequences also cast its validity into doubt: Even the OCC acknowledges that the NBA leaves in place some state substantive laws affecting banks, yet the Comptroller's rule says that the State may not *enforce* its valid, non-pre-empted laws against national banks. "To demonstrate the binding quality of a statute but deny the power of enforcement involves a fallacy made apparent by the mere statement of the proposition, for such power is essentially inherent in the very conception of law." *St. Louis, supra*, at 660. In contrast, channeling state attorneys general into judicial law-enforcement proceedings (rather than allowing them to exercise "visitorial" oversight) would preserve a regime of exclusive administrative oversight by the Comptroller while honoring in fact rather than merely in theory Congress's decision not to pre-empt substantive state law. This reading is also suggested by §484(a)'s otherwise inexplicable reservation of state powers "vested in the courts of justice." And on a pragmatic level, the difference between visitation and law enforcement is clear: If a State chooses to pursue enforcement of its laws in court, its targets are protected by discovery and procedural rules. Pp. 7–9.

(b) The Comptroller's interpretation of the regulation demonstrates its own flaw: the Comptroller is forced to limit the regulation's sweep in areas such as contract enforcement and debt collection, but those

Syllabus

exceptions rest upon neither the regulation's nor the NBA's text. Pp. 9–11.

(c) The dissent's objections are addressed and rejected. Pp. 11–13.

(d) Under the foregoing principles, the Comptroller reasonably interpreted the NBA's "visitorial powers" term to include "conducting examinations [and] inspecting or requiring the production of books or records of national banks," when the State conducts those activities as supervisor of corporations. When, however, a state attorney general brings suit to enforce state law against a national bank, he is not acting in the role of sovereign-as-supervisor, but rather sovereign-as-law-enforcer. Because such a lawsuit is not an exercise of "visitorial powers," the Comptroller erred by extending that term to include "prosecuting enforcement actions" in state courts. In this case, the Attorney General's threatened action was not the bringing of a civil suit, or the obtaining of a judicial search warrant based on probable cause, but the issuance of subpoena on his own authority if his request for information was not voluntarily honored. That is not the exercise of the law enforcement power "vested in the courts of justice," which the NBA exempts from the ban on the exercise of supervisory power. Accordingly, the injunction below is affirmed as applied to the Attorney General's threatened issuance of executive subpoenas, but vacated insofar as it prohibits the Attorney General from bringing judicial enforcement actions. Pp. 13–15.

510 F. 3d 105, affirmed in part and reversed in part.

SCALIA, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which ROBERTS, C. J., and KENNEDY and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–453

_____

ANDREW M. CUOMO, ATTORNEY GENERAL OF NEW
YORK, PETITIONER *v.* THE CLEARING HOUSE
ASSOCIATION, L. L. C., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 29, 2009]

JUSTICE SCALIA delivered the opinion of the Court.

In 2005, Eliot Spitzer, Attorney General for the State of
New York, sent letters to several national banks making a
request "in lieu of subpoena" that they provide certain
non-public information about their lending practices. He
sought this information to determine whether the banks
had violated the State's fair-lending laws. Spitzer's suc-
cessor in office, Andrew Cuomo, is the petitioner here.
Respondents, the federal Office of the Comptroller of the
Currency ("Comptroller" or "OCC") and the Clearing
House Association, a banking trade group, brought suit to
enjoin the information request, claiming that the Comp-
troller's regulation promulgated under the National Bank
Act prohibits that form of state law enforcement against
national banks.

The United States District Court for the Southern Dis-
trict of New York entered an injunction in favor of respon-
dents, prohibiting the attorney general from enforcing
state fair-lending laws through demands for records or
judicial proceedings. The United States Court of Appeals
for the Second Circuit affirmed. 510 F. 3d 105 (2007). We
granted certiorari. 555 U. S. ___ (2009). The question
presented is whether the Comptroller's regulation pur-
porting to pre-empt state law enforcement can be upheld

as a reasonable interpretation of the National Bank Act.

## I

Section 484(a) of Title 12, U. S. C., a provision of the National Bank Act, 13 Stat. 99, reads as follows:

> "No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized."

The Comptroller, charged with administering the National Bank Act, adopted, through notice-and-comment rulemaking, the regulation at issue here designed to implement the statutory provision. Its principal provisions read as follows:

> "§7.4000  Visitorial powers.
>
>   "(a) *General rule.* (1) Only the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks, except as provided in paragraph (b) of this section. State officials may not exercise visitorial powers with respect to national banks, such as conducting examinations, inspecting or requiring the production of books or records of national banks, or prosecuting enforcement actions, except in limited circumstances authorized by federal law. However, production of a bank's records (other than non-public OCC information under 12 CFR part 4, subpart C) may be required under normal judicial procedures.
>
>   "(2) For purposes of this section, visitorial powers include:
>
>   "(i)  Examination of a bank;
>
>   "(ii)  Inspection of a bank's books and records;
>
>   "(iii) Regulation  and  supervision  of  activities au-

thorized or permitted pursuant to federal banking law; and

"(iv) Enforcing compliance with any applicable federal or state laws concerning those activities." 12 CFR §7.4000 (2009).

By its clear text, this regulation prohibits the States from "prosecuting enforcement actions" except in "limited circumstances authorized by federal law."

Under the familiar *Chevron* framework, we defer to an agency's reasonable interpretation of a statute it is charged with administering. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). There is necessarily some ambiguity as to the meaning of the statutory term "visitorial powers," especially since we are working in an era when the prerogative writs—through which visitorial powers were traditionally enforced—are not in vogue. The Comptroller can give authoritative meaning to the statute within the bounds of that uncertainty. But the presence of some uncertainty does not expand *Chevron* deference to cover virtually any interpretation of the National Bank Act. We can discern the outer limits of the term "visitorial powers" even through the clouded lens of history. They do not include, as the Comptroller's expansive regulation would provide, ordinary enforcement of the law. Evidence from the time of the statute's enactment, a long line of our own cases, and application of normal principles of construction to the National Bank Act make that clear.

A

Historically, the sovereign's right of visitation over corporations paralleled the right of the church to supervise its institutions and the right of the founder of a charitable institution "to see that [his] property [was] rightly employed," 1 W. Blackstone, Commentaries on the Laws of England 469 (1765). By extension of this principle, "[t]he

king [was] by law the visitor of all civil corporations," *ibid.* A visitor could inspect and control the visited institution at will.

When the National Bank Act was enacted in 1864, "visitation" was accordingly understood as "[t]he act of examining into the affairs of a corporation" by "the government itself." 2 J. Bouvier, A Law Dictionary 790 (15th ed. 1883). Lower courts understood "visitation" to mean "the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce an observance of its laws and regulations." *First Nat. Bank of Youngstown* v. *Hughes*, 6 F. 737, 740 (CC ND Ohio 1881). A State was the "visitor" of all companies incorporated in the State, simply by virtue of the State's role as sovereign: The "legislature is the visitor of all corporations founded by it." *Guthrie* v. *Harkness*, 199 U. S. 148, 157 (1905) (internal quotation marks omitted).

This relationship between sovereign and corporation was understood to allow the States to use prerogative writs—such as mandamus and *quo warranto*—to exercise control "whenever a corporation [wa]s abusing the power given it, or, . . . or acting adversely to the public, or creating a nuisance." H. Wilgus, Private Corporations, in 8 American Law and Procedure §157, pp. 224–225 (1910). State visitorial commissions were authorized to "exercise a general supervision" over companies in the State. I. Wormser, Private Corporations §80, pp. 100, 101, in 4 Modern American Law (1921).

## B

Our cases have always understood "visitation" as this right to oversee corporate affairs, quite separate from the power to enforce the law. In the famous *Dartmouth College* case, Justice Story, describing visitation of a charitable corporation, wrote that Dartmouth was "subject to the

controlling authority of its legal visitor, who . . . may amend and repeal its statutes, remove its officers, correct abuses, and generally superintend the management of [its] trusts," and who are "liable to no supervision or control." *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 676, 681 (1819) (concurring opinion). This power of "genera[l] superintend[ence]" stood in contrast to action by the court of chancery, which acted "not as itself possessing a visitorial power . . . but as possessing a general jurisdiction . . . to redress grievances, and frauds." *Id.*, at 676.[1]

In *Guthrie, supra,* we held that a shareholder acting in his role as a private individual was not exercising a "visitorial power" under the National Bank Act when he petitioned a court to force the production of corporate records, *id.*, at 159. "[C]ontrol in the courts of justice," we said, is not visitorial, and we drew a contrast between the nonvisitorial act of "su[ing] in the courts of the State" and the visitorial "supervision of the Comptroller of the Currency," *id.*, at 159, 157.

In *First Nat. Bank in St. Louis* v. *Missouri*, 263 U. S. 640 (1924), we upheld the right of the Attorney General of Missouri to bring suit to enforce a state anti-bank-branching law against a national bank. We said that only the United States may perform visitorial administrative

---

[1] JUSTICE THOMAS's opinion concurring in part and dissenting in part (hereinafter the dissent) attempts to distinguish *Dartmouth College* on the ground that the college was a charitable corporation, whose visitors (unlike the State as visitor of for-profit corporations) had no law-enforcement power. See *post*, at 7, n. 1. We doubt that was so. As Justice Story's opinion in *Dartmouth College* stated, visitors of charitable corporations had "power . . . to correct all irregularities and abuses," 4 Wheat., at 673, which would surely include operations in violation of law. But whether or not visitors of charitable corporations had law-enforcement powers, the powers that they *did* possess demonstrate that visitation is different from ordinary law enforcement. Indeed, if those powers did not include the power to assure compliance with law that demonstration would be all the more forceful.

oversight, such as "inquir[ing] by *quo warranto* whether a national bank is acting in excess of its charter powers." *Id.*, at 660. But if a state statute of general applicability is not substantively pre-empted, then "the power of enforcement must rest with the [State] and not with" the National Government, *ibid.*[2]

Our most recent decision, *Watters* v. *Wachovia Bank, N. A.*, 550 U. S. 1 (2007), does not, as the dissent contends, *post*, at 18, "suppor[t] OCC's construction of the statute." To the contrary, it is fully in accord with the well established distinction between supervision and law enforcement. *Watters* held that a State may not exercise "'general supervision and control'" over a subsidiary of a national bank, 550 U. S., at 8, because "multiple audits and surveillance under rival oversight regimes" would cause uncertainty, *id.*, at 21. "[G]eneral supervision and control" and "oversight" are worlds apart from law enforcement. All parties to the case agreed that Michigan's general oversight regime could not be imposed on national banks; the sole question was whether operating subsidiaries of national banks enjoyed the same immunity from state visitation. The opinion addresses and answers no other question.

_____

[2] The dissent attempts to distinguish *St. Louis* by invoking the principle that an agency is free to depart from a court's interpretation of the law. *Post*, at 16–17 (citing *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 982 (2005)). This again misses the point. *St. Louis* is relevant to proper interpretation of 12 U. S. C. §484(a) not because it is authoritative on the question whether States can enforce their banking laws, but because it is one in a long and unbroken line of cases distinguishing visitation from law enforcement. Respondents contend that *St. Louis* holds only that States can enforce their law when federal law grants the national bank no authority to engage in the activity at issue. Even if that were true it would make no difference. The case would still stand for the proposition that the exclusive federal power of visitation does not prevent States from enforcing their law.

The foregoing cases all involve enforcement of state law. But if the Comptroller's exclusive exercise of visitorial powers precluded law enforcement by the States, it would also preclude law enforcement by federal agencies. Of course it does not. See, *e.g.*, *Bank of America Nat. Trust & Sav. Assn.* v. *Douglas*, 105 F. 2d 100, 105–106 (CADC 1939) (Securities Exchange Commission investigation of bank fraud is not an exercise of "visitorial powers"); *Peoples Bank of Danville* v. *Williams*, 449 F. Supp. 254, 260 (WD Va. 1978) (same).

In sum, the unmistakable and utterly consistent teaching of our jurisprudence, both before and after enactment of the National Bank Act, is that a sovereign's "visitorial powers" and its power to enforce the law are two different things. There is not a credible argument to the contrary. And contrary to what the Comptroller's regulation says, the National Bank Act pre-empts only the former.

## C

The consequences of the regulation also cast doubt upon its validity. No one denies that the National Bank Act leaves in place some state substantive laws affecting banks. See Brief for Federal Respondent 20; Brief for Respondent Clearing House Association, L. L. C. 29; *post,* at 16–17. But the Comptroller's rule says that the State may not *enforce* its valid, non-pre-empted laws against national banks. *Ibid.* The bark remains, but the bite does not.

The dissent admits, with considerable understatement, that such a result is "unusual," *ibid.* "Bizarre" would be more apt. As the Court said in *St. Louis:*

> "To demonstrate the binding quality of a statute but deny the power of enforcement involves a fallacy made apparent by the mere statement of the proposition, for such power is essentially inherent in the very conception of law." 263 U. S., at 660.

In sharp contrast to the "unusual" reading propounded by the Comptroller's regulation, reading "visitorial powers" as limiting only sovereign oversight and supervision would produce an entirely commonplace result—the precise result contemplated by our opinion in *St. Louis*, which said that if a state statute is valid as to national banks, "the corollary that it is obligatory *and enforceable* necessarily results." *Id.,* at 659–660 (emphasis added). Channeling state attorneys general into judicial law-enforcement proceedings (rather than allowing them to exercise "visitorial" oversight) would preserve a regime of exclusive administrative oversight by the Comptroller while honoring in fact rather than merely in theory Congress's decision not to pre-empt substantive state law. This system echoes many other mixed state/federal regimes in which the Federal Government exercises general oversight while leaving state substantive law in place. See, *e.g.*, *Wyeth* v. *Levine*, 555 U. S. ___ (2009).

This reading is also suggested by §484(a)'s otherwise inexplicable reservation of state powers "vested in the courts of justice." As described earlier, visitation was normally conducted through use of the prerogative writs of mandamus and *quo warranto*. The exception could not possibly exempt that manner of exercising visitation, or else the exception would swallow the rule. Its only conceivable purpose is to preserve normal civil and criminal lawsuits. To be sure, the reservation of powers "vested in the courts of justice" is phrased as an exception from the prohibition of visitorial powers. But as we have just discussed, it cannot possibly be that, and it is explicable only as an attempt to make clear that the courts' ordinary powers of enforcing the law are not affected. [3]

---

[3] We reject respondents' contention that the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, §102(f)(1)(B), 108 Stat. 2349, 2350, 12 U. S. C. §36(f)(1)(B), establishes that the Comptroller's

On a pragmatic level, the difference between visitation and law enforcement is clear.  If a State chooses to pursue enforcement of its laws in court, then it is not exercising its power of visitation and will be treated like a litigant. An attorney general acting as a civil litigant must file a lawsuit, survive a motion to dismiss, endure the rules of procedure and discovery, and risk sanctions if his claim is frivolous or his discovery tactics abusive.  Judges are trusted to prevent "fishing expeditions" or an undirected rummaging through bank books and records for evidence of some unknown wrongdoing.  In New York, civil discovery is far more limited than the full range of "visitorial powers" that may be exercised by a sovereign.  Courts may enter protective orders to prevent "unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice," N. Y. Civ. Prac. Law Ann. §3103(a) (West 2005), and may supervise discovery *sua sponte*, §3104(a). A visitor, by contrast, may inspect books and records at any time for any or no reason.

## II

The Comptroller's regulation, therefore, does not comport with the statute.  Neither does the Comptroller's *interpretation* of its regulation, which differs from the text and must be discussed separately.

Evidently realizing that exclusion of state enforcement of *all* state laws against national banks is too extreme to be contemplated, the Comptroller sought to limit the

---

visitorial power pre-empts state law enforcement.  That provision states that some state laws respecting bank branching "shall be enforced" by the Comptroller.  We need not decide here whether converting the Comptroller's visitorial *power* to assure compliance with all applicable laws, see *infra*, at 12, into an *obligation* to assure compliance with certain state laws preempts state enforcement of those particular laws.  Even if it had that effect it would shed no light on the meaning of "visitorial powers" in the National Bank Act, a statute that it does not refer to and that was enacted more than a century earlier.

sweep of its regulation by the following passage set forth in the agency's statement of basis and purpose in the Federal Register:

> "What the case law *does* recognize is that 'states retain some power to regulate national banks in areas such as contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law.' [citing a Ninth Circuit case.] Application of these laws to national banks and their implementation by state authorities typically does not affect the content or extent of the Federally-authorized business of banking . . . but rather establishes the legal infrastructure that surrounds and supports the ability of national banks . . . to do business." 69 Fed. Reg. 1896 (2004) (footnote omitted).

This cannot be reconciled with the regulation's almost categorical prohibition in 12 CFR §7.4000(a)(1) of "prosecuting enforcement actions."[4]  Nor can it be justified by the provision in subsection (a)(2)(iv) which defines visitorial powers to include "[e]nforcing compliance with any applicable . . . state laws concerning" "activities authorized or permitted pursuant to federal banking law," §7.4000(a)(2)(iii).  The latter phrase cannot be interpreted

——————

[4] The prohibition is not entirely categorical only because it is subject to the phrase at the end of the sentence (applicable to all of the regulation's enumerated "visitorial powers" forbidden to the States): "except in limited circumstances authorized by federal law."  This replicates a similar exception contained in §484(a) itself ("No national bank shall be subject to any visitorial powers except as authorized by Federal law"), and certainly does not refer to case law finding state action nonpre-empted.  If it meant that, §484(a)'s apparent limitation of visitorial powers would be illusory—saying, in effect, that national banks are subject to only those visitorial powers that the courts say they are subject to.  Cases that find state action nonpre-empted might perhaps be described as "permitting" the state action in question, but hardly as "authorizing" it.  In both the statutory and regulation context, "federal law" obviously means federal statutes.

to include only distinctively banking activities (leaving the States free to enforce nonbanking state laws), because if it were so interpreted subsection (a)(2)(iii), which uses the same terminology, would limit the Comptroller's exclusive visitorial power of "regulation and supervision" to distinctively banking activities—which no one thinks is the case. Anyway, the National Bank Act *does* specifically authorize and permit activities that fall within what the statement of basis and purpose calls "the legal infrastructure that surrounds and supports the ability of national banks . . . to do business." See, *e.g.*, 12 U. S. C. §24 Third (power to make contracts); §24 Seventh ("all such incidental powers as shall be necessary to carry on the business of banking"). And of course a distinction between "implementation" of "infrastructure" and judicial enforcement of other laws can be found nowhere within the text of the statute. This passage in the statement of basis and purpose, resting upon neither the text of the regulation nor the text of the statute, attempts to do what Congress declined to do: exempt national banks from all state banking laws, or at least state enforcement of those laws.

## III

The dissent fails to persuade us. Its fundamental contention—that the exclusive grant of visitorial powers can be interpreted to preclude state enforcement of state laws—rests upon a logical fallacy. The dissent establishes, *post*, at 8–9 (and we do not at all contest), that in the course of exercising visitation powers the sovereign can compel compliance with the law. But it concludes from that, *post*, at 11, that *any* sovereign attempt to compel compliance with the law can be deemed an exercise of the visitation power. That conclusion obviously does not follow. For example, in the course of exercising its visitation powers, the sovereign can assuredly compel a bank to honor obligations that are in default. Does that mean that

the sovereign's taking the same action in executing a civil judgment for payment of those obligations can be considered an exercise of the visitation power? Of course not. Many things can be compelled through the visitation power that can be compelled through the exercise of other sovereign power as well. The critical question is not what is being compelled, but what sovereign power has been invoked to compel it. And the power to enforce the law exists separate and apart from the power of visitation.

The dissent argues that the Comptroller's expansive reading of "visitorial powers" does not intrude upon the, "'the historic police powers of the States,'" *post*, at 20, (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)), because, like federal maritime law, federal involvement in this field dates to "'the earliest days of the Republic,'" *post,* at 21 (quoting *United States* v. *Locke*, 529 U. S. 89, 108 (2000). For that reason, the dissent concludes, this case does not raise the sort of federalism concerns that prompt a presumption against pre-emption. We have not invoked the presumption against pre-emption, and think it unnecessary to do so in giving force to the plain terms of the National Bank Act. Neither, however, should the incursion that the Comptroller's regulation makes upon traditional state powers be minimized. Although the sovereign visitorial power of assuring national-bank compliance with *all* laws inhered in the Federal Government from the time of its creation of national banks, the Comptroller was not given authority to enforce nonpre-empted state laws until 1966. See Financial Institutions Supervisory Act of 1966, Tit. III, 80 Stat. 1046–1055. A power first exercised during the lifetime of every current Justice is hardly involvement "from the earliest days of the Republic."

States, on the other hand, have always enforced their general laws against national banks—and have enforced their banking-related laws against national banks for at

least 85 years, as evidenced by *St. Louis*, in which we upheld enforcement of a state anti-bank-branching law, 263 U. S., at 656. See also *Anderson Nat. Bank* v. *Luckett*, 321 U. S. 233, 237, 248–249 (1944) (state commissioner of revenue may enforce abandoned-bank-deposit law against national bank through "judicial proceedings"); *State by Lord* v. *First Nat. Bank of St. Paul*, 313 N. W. 2d 390, 393 (Minn. 1981) (state treasurer may enforce general unclaimed-property law with "specific provisions directed toward" banks against national bank); *Clovis Nat. Bank* v. *Callaway*, 69 N. M. 119, 130–132, 364 P. 2d 748, 756 (1961) (state treasurer may enforce unclaimed-property law against national bank deposits); *State* v. *First Nat. Bank of Portland*, 61 Ore. 551, 554–557, 123 P. 712, 714 (1912) (state attorney general may enforce bank-specific escheat law against national bank).[5]

The dissent seeks to minimize the regulation's incursion upon state powers by claiming that the regulation does not "declare the pre-emptive scope of the [National Bank Act]" but merely "interpret[s] the term 'visitorial powers.'" *Post,* at 20. That is much too kind. It is not without reason that the regulation is contained within a subpart of the Comptroller's regulations on Bank Activities and Operations that is entitled "Preemption." The purpose and function of the statutory term "visitorial powers" is to define and thereby limit the category of action reserved to the Federal Government and forbidden to the States. Any interpretation of "visitorial powers" necessarily "declares the pre-emptive scope of the NBA," *ibid.* What is clear from logic is also clear in application: The regulation declares that "[s]tate officials may not . . . prosecut[e] enforcement

_____

[5] All of these cases were decided before Congress added to §484 its current subsection (b), which authorizes "State auditors and examiners" to review national-bank records to assure compliance with state unclaimed-property and escheat laws. See 96 Stat. 1521.

actions." 12 CFR §7.4000(a). If that is not pre-emption, nothing is.

## IV

Applying the foregoing principles to this case is not difficult. "Visitorial powers" in the National Bank Act refers to a sovereign's supervisory powers over corporations. They include any form of administrative oversight that allows a sovereign to inspect books and records on demand, even if the process is mediated by a court through prerogative writs or similar means. The Comptroller reasonably interpreted this statutory term to include "conducting examinations [and] inspecting or requiring the production of books or records of national banks," §7.4000, when the State conducts those activities in its capacity as supervisor of corporations.

When, however, a state attorney general brings suit to enforce state law against a national bank, he is not acting in the role of sovereign-as-supervisor, but rather in the role of sovereign-as-law-enforcer. Such a lawsuit is not an exercise of "visitorial powers" and thus the Comptroller erred by extending the definition of "visitorial powers" to include "prosecuting enforcement actions" in state courts, §7.4000.

The request for information in the present case was stated to be "in lieu of" other action; implicit was the threat that if the request was not voluntarily honored, that other action would be taken. All parties have assumed, and we agree, that if the threatened action would have been unlawful the request-cum-threat could be enjoined. Here the threatened action was not the bringing of a civil suit, or the obtaining of a judicial search warrant based on probable cause, but rather the Attorney General's issuance of subpoena on his own authority under New York Executive Law, which permits such subpoenas in connection with his investigation of "repeated fraudulent or illegal acts . . . in the carrying on, conducting or

transaction of business."    See N. Y. Exec. Law Ann. §63(12) (West 2002).  That is not the exercise of the power of law enforcement "vested in the courts of justice" which 12 U. S. C. §484(a) exempts from the ban on exercise of supervisory power.

Accordingly, the injunction below is affirmed as applied to the threatened issuance of executive subpoenas by the Attorney General for the State of New York, but vacated insofar as it prohibits the Attorney General from bringing judicial enforcement actions.

*     *     *

The judgment of the Court of Appeals is affirmed in part and reversed in part.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–453

_____

ANDREW M. CUOMO, ATTORNEY GENERAL OF NEW YORK, PETITIONER *v.* THE CLEARING HOUSE ASSOCIATION, L. L. C., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 29, 2009]

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE ALITO join, concurring in part and dissenting in part.

The Court holds that the term "visitorial powers" as used in the National Bank Act (NBA), 12 U. S. C. §484(a), refers only "to a sovereign's supervisory powers over corporations," which are limited to "administrative oversight" including "inspect[ion of] books and records on demand." *Ante*, at 14. Based on this definition, the Court concludes that §484(a) does not pre-empt a "state attorney general['s] . . . suit to enforce state law against a national bank." *Ibid.* I would affirm the Court of Appeals' determinations that the term "visitorial powers" is ambiguous and that it was reasonable for the Office of the Comptroller of the Currency (OCC) to interpret the term to encompass state efforts to obtain national bank records and to enforce state fair lending laws against national banks. Accordingly, I respectfully concur in part and dissent in part.

## I

## A

The NBA provides that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized." 12 U. S. C. §484(a). Through notice-and-comment rulemaking, OCC issued a regulation defining "visitorial powers" as including: "(i) Examination of a bank; (ii) Inspection of a bank's books and records; (iii) Regulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv) Enforcing compliance with any applicable federal or state laws concerning those activities." 12 CFR §7.4000(a)(2) (2005). OCC further concluded that 12 U. S. C. §484(a)'s "vested in the courts of justice" exception pertains only to the "powers inherent in the judiciary and does not grant state or other governmental authorities any right to inspect, superintend, direct, regulate or compel compliance by a national bank with respect to any law, regarding the content or conduct of activities authorized for national banks under Federal law." 12 CFR §7.4000(b)(2). The Court of Appeals upheld OCC's regulation as reasonable. See 510 F. 3d 105 (CA2 2007).

This Court's decision in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), provides the framework for deciding this case. "In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion." *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 980 (2005). Accordingly, "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's con-

struction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Ibid.*

OCC is "the administrator charged with supervision of the [NBA]," *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.*, 513 U. S. 251, 256 (1995), and it acted through notice-and-comment rulemaking procedures in promulgating the regulation at issue in this case, see 69 Fed. Reg. 1895 (2004). As a result, 12 CFR §7.4000 falls within the heartland of *Chevron.* See *United States* v. *Mead Corp.*, 533 U. S. 218, 229–230 (2001); see also, *e.g.*, *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 739 (1996) (deferring to OCC's interpretation of the term "'interest'" in the NBA). "It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering," and "that practice extends to the judgments of the Comptroller of the Currency with regard to the meaning of the banking laws." *Ibid.* The majority does not disagree. See *ante*, at 3. As a result, the only disputed question is whether the statutory term "visitorial powers" is ambiguous and, if so, whether OCC's construction of it is reasonable.

B

The majority concedes that there is "some ambiguity as to the meaning of the statutory term 'visitorial powers.'" *Ibid.* Yet it concludes that OCC's interpretation of §484(a) is not entitled to deference because the Court "can discern the outer limits of the term 'visitorial powers' even through the clouded lens of history" and these outer definitional limits "do not include . . . ordinary enforcement of the law." *Ibid.* I cannot agree. The statutory term "visitorial powers" is susceptible to more than one meaning, and the agency's construction is reasonable.

Because the NBA does not define "visitorial powers," the

ordinary meaning of the words chosen by Congress provides the starting point for interpreting the statute. See *Dean* v. *United States*, 556 U. S. ___, ___ (2009) (slip op., at 3) ("We start, as always, with the language of the statute" (internal quotation marks omitted)); *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning"). In 1864, when the NBA was enacted, "visitation" was generally defined as "[i]nspection; superintendence; direction; [and] regulation." 2 A. Burrill, A Law Dictionary and Glossary 598 (1860); see also 2 J. Bouvier, A Law Dictionary 633 (1852) (defining "visitation" as "[t]he act of examining into the affairs of a corporation"). With respect to civil corporations, "visitation" was conducted "by the government itself, through the medium of the courts of justice." *Id.,* at 634. The Court has previously looked to these definitions in examining the meaning of "visitorial powers" for purposes of the NBA. See *Guthrie* v. *Harkness*, 199 U. S. 148, 158 (1905).

OCC's interpretation of "visitorial powers" to include both "[r]egulation and supervision of activities authorized or permitted pursuant to federal banking law" and "[e]nforcing compliance with any applicable federal or state laws concerning those activities," 12 CFR §§7.4000(a)(2)(iii), (vi), fits comfortably within this broad dictionary definition of "visitation." And, in turn, petitioner's demand for nonpublic information to force national banks to comply with state fair lending laws under threat of judicial action would appear to qualify as an attempt to "superinten[d]" the banks' federally authorized operations "through the medium of the courts of justice." See Burrill, *supra,* at 598; Bouvier, *supra,* at 634.

On the other hand, as the majority concludes, "visitorial powers" could be limited to conducting examinations of national banks or otherwise interfering with their internal operations. To support this argument, the majority briefly

alludes to the common-law history of visitation. See *ante*, at 3–4; see also *United States* v. *Shabani*, 513 U. S. 10, 13 (1994) ("[A]bsent contrary indications, Congress intends to adopt the common law definition of statutory terms"). In so doing, the majority fully accepts petitioner's argument that "Congress invoked a then-familiar common law term of corporate governance—visitation—to clarify that the States, traditionally the supervisors of private corporations doing business within their jurisdictions, had no authority to examine the condition of a national bank, respond to any perceived financial risk, or hold the bank to its charter or the laws of its creation." Brief for Petitioner 21–22. Under the majority's view, any construction of §484(a) that fails to preserve the right of the States to enforce through judicial action their generally applicable laws against national banks is unreasonable and, therefore, not entitled to deference. See *ante*, at 6–7.

But contrary to the majority's determination, the common-law tradition does not compel the conclusion that petitioner's definition of visitation is the only permissible interpretation of the term. Indeed, a more thorough examination of §484(a)'s common-law ancestry suggests the opposite. As the majority notes, see *ante*, at 3–4, the concept of visitation originated in Roman and canon law in which the term was used to describe the church hierarchy's authority over its own institutions, see Pound, Visitatorial Jurisdiction Over Corporations in Equity, 49 Harv. L. Rev. 369, 369–370 (1936). The practice of visitation later expanded to include the supervision of charities, universities, and civil corporations. *Ibid.*

With respect to churches, charities, and universities, a visitor's duties were narrow. In the university setting, for example, the "power of the visitor [was] confined to offences against the *private* laws of the college; he ha[d] no cognizance of acts of disobedience to the general laws of the land." 2 S. Kyd, Law of Corporations 276 (1794) (em-

phasis in original). The visitor's duties were equally nar-
row in the governance of ecclesiastical and charitable
institutions. See 1 W. Blackstone, Commentaries on the
Laws of England 467–472 (1765); *Trustees of Dartmouth
College* v. *Woodward*, 4 Wheat. 518, 673–677 (1819)
(Story, J., concurring). If the sweep of a visitor's authority
with respect to civil corporations was the same, the major-
ity would have a stronger argument that the "visitorial
powers" prohibition was similarly limited. See *ante*, at 3–
4. However, the common-law tradition instead suggests
that visitorial powers were broader with respect to civil
corporations, including banks.

Historically, visitorial authority over civil corporations
was exercised only by the sovereign who had broad au-
thority to assure compliance with generally applicable
laws. See Blackstone, *supra,* at 469 ("The king being thus
constituted by law the visitor of all civil corporations, the
law has also appointed the place, wherein he shall exercise
this jurisdiction: which is the court of king's bench; where,
and where only, all misbehaviors of this kind of corpora-
tions are enquired into and redressed, and all their con-
troversies decided"); 2 J. Kent, Commentaries on Ameri-
can Law 241 (1827) (explaining that "visitation of civil
corporations is by the government itself, through the
medium of the courts of justice"). "Civil corporations,
whether public, as the corporations of towns and cities; or
private, as bank, insurance, manufacturing, and other
companies of the like nature, are not subject to [private]
visitation. They are subject to the general law of the land,
and amenable to the judicial tribunals for the exercise and
the abuse of their powers." *Id.*, at 244; see also J. Angell &
S. Ames, Law of Private Corporations §684, p. 680 (4th ed.
1852) ("Civil corporations, whether public or private, being
created for public use and advantage, properly fall under
the superintendency of that sovereign power whose duty it
is to take care of the public interest; whereas, corpora-

tions, whose object is the distribution of a private benefaction, may well find jealous guardians in the zeal or vanity of the founder, his heirs, or appointees").

States have traditionally exercised their visitorial powers over civil corporations by invoking the authority of the judiciary to "compel domestic corporations or their officers to perform specific duties incumbent on them by reason of their charters, *or under statutes or ordinances or imposed by the common law.*"  Pound, *supra*, at 375 (emphasis added); see also S. Merrill, Law of Mandamus §158, p. 194 (1892) (explaining that "under the visitorial power of the state, any breach of duty by a private corporation may be corrected by" the writ of mandamus and that the duty "may be imposed by [the corporation's] charter, by the general statutes, or by the common law" (footnotes omitted)).  As Merrill explained, such actions were employed to compel common carriers and certain other civil corporations to adhere to "statutory or common law" duties, including the duty to "exten[d] to all without discrimination the use of their services."  *Id.*, §162, at 200; see also J. Grant, A Practical Treatise on the Law of Corporations in General, As Well Aggregate as Sole 262 (1854) (explaining that mandamus was available when corporations "refuse[d] to perform a duty cast upon them by the law of the land").[1]

——————

[1] By looking to Justice Story's concurrence in *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518 (1819), for authoritative guidance, see *ante*, at 4–5, the majority seemingly rejects the distinction between the visitor's role in supervising civil corporations and the visitor's far more limited role in supervising private institutions such as churches, universities, and charitable organizations.  See *ante*, at 5, n. 1.  In *Woodward*, the Court addressed the scope of the visitor's authority over a private college—not a civil corporation.  See 4 Wheat., at 562–563 ("The corporation in question is not a *civil*, although it is a *lay* corporation.  It is an *eleemosynary* corporation. . . . Eleemosynary corporations are for the management of private property, according to the will of the donors.  They are private corporations" (emphasis in original)).  Visitors

Even before enactment of the NBA, several States enacted laws granting banking commissioners specific authority to investigate compliance with generally applicable laws and to use the courts to ensure observance therewith. See, *e.g.*, Act of Feb. 23, ch. 14, §2, 1838 Mass. Acts p. 303 (authorizing banking commissioners to "visit" a bank and "examine all [its] affairs" to determine whether it had "complied with the provisions of law applicable to [its] transactions"); Act of May 14, ch. 363, §12, 1840 N. Y. Laws pp. 307–308 (authorizing banking commissioners to bring judicial actions against banks "found to have violated any law of this state . . . in the same manner and with the like effect as any incorporated bank may be proceeded against for a violation of its charter"). Indeed, Congress modeled the NBA after New York's supervisory regime. See J. Knox, A History of Banking in the United States 422 (1903) (reprint 1969).

Petitioner contends, and the majority agrees, that this understanding of the common law confuses the sovereign's "enforcement of general laws that apply equally to all actors within a State, like the ban on discrimination found in New York Executive Law §296–a" with "an exercise of visitorial powers." Brief for Petitioner 24; see also *ante*, at 7 (concluding that "a sovereign's 'visitorial powers' and its power to enforce the law are two different things"). But this narrow conception of visitorial powers does not fully capture the common law. In a section entitled "Visitorial

_____

historically did not have "law enforcement power" over churches, universities, and charitable organizations. See *supra*, at 5–6. But there is strong evidence that visitors of civil corporations—*i.e.*, sovereigns—were so empowered. See *supra*, at 6–7. The distinction between these species of visitation is crucial because it yields divergent understandings as to the scope of the visitor's power to enforce generally applicable laws in court. Moreover, the majority's failure to confront this important difference leaves a gap in its historical analysis that, in turn, undermines its conclusion that OCC's interpretation of §484(a) was unreasonable.

power," one treatise explained that "[a]s a general rule the state has the same control, in this respect, over corporations that it has over individuals." C. Elliott, Law of Private Corporations §90, p. 80 (rev. 3d ed. 1900); see also 1 S. Thompson, Commentaries on the Law of Private Corporations §475, p. 580 (2d ed. 1908) ("In its visitorial capacity the state checks and controls corporate affairs, even for the protection of those who deal with them"). If the sovereign's power of visitation was limited to oversight of "corporate affairs," visitation would not parallel the sovereign's control over individuals or allow the sovereign to protect through judicial action the rights of individuals who "deal with" the corporation. See *ibid.*

The Wisconsin Supreme Court's decision in *Attorney General* v. *Chicago & Northwestern R. Co.*, 35 Wis. 425 (1874)—which has been referred to as "the leading American case for the visitorial jurisdiction of equity," Pound, 49 Harv. L. Rev., at 380—illustrates the point. In that case, the state attorney general sought a writ of injunction to "restrain the two defendant companies from exacting tolls for the carriage of passengers or freight in excess of the maximum rates established by" Wisconsin law, 35 Wis., at 432. The attorney general "appl[ied] for the writ on behalf of the public," *id.*, at 531, in order "'to correct abuses and save the rights of the people,'" *id.*, at 572. The court found that the attorney general's visitorial power included enforcement of generally applicable law against civil corporations through courts of equity. See *id.*, at 529–530. As the court explained, the common-law understanding of visitorial powers had expanded beyond its ecclesiastical roots to include such authority. See *id.*, at 530 ("The grounds on which this jurisdiction rests are ancient; but the extent of its application has grown rapidly of late years, until a comparatively obscure and insignificant jurisdiction has become one of great magnitude and public import").

As a result, the majority's conclusion that when "a state attorney general brings suit to enforce state law against a national bank, he is not acting in the role of sovereign-as-supervisor, but rather in the role of sovereign-as-law-enforcer," *ante*, at 14, cannot be reconciled with this leading case or the general common-law understanding on which the decision rests. At common law, all attempts by the sovereign to compel civil corporations to comply with state law—whether through administrative subpoenas or judicial actions—were visitorial in nature. Thus, even if the sovereign's law enforcement and visitorial powers were at one time distinct, by common law, they had merged at least with respect to the enforcement of generally applicable public laws against civil corporations. See Thompson, *supra*, §460, at 556 ("The police power, *in its visitorial aspect*, as exercised by congress and the several states, extends to the minutest details of the banking business" (emphasis added)). By construing visitation so narrowly, the majority implicitly rejects the efforts of William Blackstone, James Kent, and Roscoe Pound, see *supra*, at 6–7, in elucidating the historical meaning of this concept. Like OCC, each of these venerable legal scholars understood visitation of civil corporations to include the power to enforce generally applicable laws through judicial actions. See *ibid.*

In the end, OCC was presented with a broad dictionary definition of "visitation" and a common-law history suggesting that the scope of the visitor's authority varied in accordance with the nature of the organization under supervision. It is possible that the "visitorial powers" are narrower than OCC concluded. But a visitor's powers could also be broader. There is support for the proposition that visitation includes enforcement of all generally applicable laws. See *supra*, at 5–10. OCC instead interpreted "visitorial powers" to prohibit only enforcement of laws concerning "activities authorized or permitted pursuant to

federal banking law." 12 CFR §§7.4000(a)(2)(iii) and (iv). States are thus free to enforce applicable laws that do not regulate federally authorized banking activities, see §7.4000(a)(3), "including, for example, criminal, tax, zoning, and labor and employment laws," Brief for Federal Respondent 15 (citing 69 Fed. Reg. 1896).

Thus, although the text and history of visitation do not authoritatively support either party's construction of the statute, OCC's decision to adopt a more modest construction than could have been supported by the common-law and dictionary definition reinforces the reasonableness of its regulation. Put simply, OCC selected a permissible construction of a statutory term that was susceptible to multiple interpretations.

C

Petitioner nonetheless argues that the original structure of the NBA compels us to adopt his reading of "visitorial powers." When enacted in 1864, the "visitorial powers" clause was preceded by a statutory provision directing the Comptroller of the Currency to appoint persons "to make a thorough examination into all the affairs of [every banking] association" and to "make a full and detailed report of the condition of the association to the comptroller." Act of June 3, 1864, ch. 106, §54, 13 Stat. 116. In addition, the "visitorial powers" clause was succeeded by a sentence concerning the compensation due to the examiners. See *ibid.* Petitioner contends that the placement of the "visitorial powers" clause between these two provisions indicates that it originally meant to ban States only from conducting the particular type of "thorough examination" of banking affairs described in the neighboring provisions. And, petitioner adds, §484 currently resides in the subchapter of the statute entitled "Bank Examinations," which still includes a provision directing the Comptroller to appoint examiners "to make a thorough examination of

all the affairs of the bank and . . . make a full and detailed report of the condition of said bank to the Comptroller of the Currency." 12 U. S. C. §481.

Petitioner's argument is undermined, however, by other structural attributes of this subchapter. In §484(b), for example, Congress provided that "[n]otwithstanding" the statute's visitorial-powers prohibition, "State auditors and examiners may . . . review [a national bank's] records solely to ensure compliance with applicable State unclaimed property or escheat laws." Such review does not fall within petitioner's definition of "visitorial powers" because the enforcement of state property laws is in no way associated with national bank examinations or internal operations. Thus, were §484(a) to have the meaning petitioner assigns, there would have been no reason for Congress to identify the §484(b) authority as an exception to §484(a)'s "visitorial powers" prohibition, as the authority granted in §484(b) would never have been eliminated by §484(a).

Other exceptions in §484 also support OCC's construction of the statute. For example, §484(a) includes an exception for visitations "authorized by Federal law." One type of visitation authorized by law is described in 26 U. S. C. §3305(c), which provides that "[n]othing contained in [§484] shall prevent any State from requiring any national" bank to provide payroll records and reports for unemployment tax purposes. Similarly, 12 U. S. C. §62 permits state tax officials to inspect national bank shareholder lists. Both provisions would be unnecessary if "visitorial powers" were limited to bank examinations and internal operations.

In sum, the NBA's structure does not compel the construction of §484(a)'s text that petitioner advocates. If anything, given the manner in which Congress crafted exceptions to the "visitorial powers" ban in the statute, the

opposite is true.[2]

## D

The majority also accepts petitioner's contention that OCC's construction of "visitorial powers" is unreasonable because it conflicts with several of this Court's decisions. See *ante*, at 4–7. But petitioner cannot prevail by simply showing that this Court previously adopted a construction of §484 that differs from the interpretation later chosen by the agency. "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U. S., at 982. These decisions do not construe §484 in a manner that trumps OCC's regulation.

---

[2] Contrary to the majority's conclusion, see *ante*, at 8–9, n. 3, petitioner's structural argument is also undermined by the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 (Riegle-Neal), 108 Stat. 2338, which authorized national banks to operate interstate branches. The statute provides that "[t]he laws of the host State regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches shall apply to any branch in the host State of an out-of-State national bank to the same extent as such State laws apply to a branch of a bank chartered by that State" unless federal law separately pre-empts their application or the Comptroller determines that application of the state law would have a "discriminatory effect" on the national bank branch. See *id.*, at 2349–2350, 12 U. S. C. §36(f)(1)(A). Riegle-Neal further provides that "[t]he provisions of any State law to which a branch of a national bank is subject under this paragraph shall be enforced, with respect to such branch, by the Comptroller of the Currency." See *id.*, at 2350, 12 U. S. C. §36(f)(1)(B). The United States has interpreted the "shall be enforced" language to provide OCC with exclusive enforcement authority. See Brief for Federal Respondent 46–48. This construction reinforces OCC's interpretation of §484(a). If OCC has exclusive authority to enforce state law with respect to interstate branches of national banks, it would be reasonable to interpret the statute to operate similarly with respect to the national banks themselves.

This Court's *only* decision directly addressing the meaning of "visitorial powers" is *Guthrie*, which held that the NBA did not prohibit a suit brought by a private shareholder seeking to inspect the books of a national bank, 199 U. S., at 157. In so holding, the Court contrasted "the private right of the shareholder to have an examination of the business in which he is interested" with a visitor's "public right" to examine "the conduct of the corporation with a view to keeping it within its legal powers." *Id.,* at 158–159. *Guthrie* thus draws a line between enforcement of private rights and the public act of visitation that is consistent with the definition of visitation embraced by OCC. See *id.,* at 158 ("In no case or authority that we have been able to find has there been a definition of this right, which would include the private right of the shareholder to have an examination of the business in which he is interested . . ."). The agency has never taken the position that the "visitorial powers" prohibition extends to private action.

Nor does this Court's decision in *First Nat. Bank in St. Louis* v. *Missouri*, 263 U. S. 640 (1924) *(St. Louis),* foreclose OCC's construction of the statute. In that case, the State of Missouri brought a *quo warranto* proceeding in state court "to determine [the national bank's] authority to establish and conduct a branch bank in the City of St. Louis." *Id.,* at 655. The Court first held that federal law did not authorize national banks to engage in branch banking. See *id.,* at 656–659. "Having determined that the power sought to be exercised by the bank finds no justification in any law or authority of the United States," the Court then concluded that "the way is open for the enforcement of the state statute." *Id.,* at 660.

Petitioner contends, and the majority agrees, see *ante,* at 5–6, and n. 2, that *St. Louis* stands for the proposition that a State retains the right to enforce any state law that is not substantively pre-empted with respect to national

banks, see 263 U. S., at 660 ("To demonstrate the binding quality of a statute but deny the power of enforcement involves a fallacy made apparent by the mere statement of the proposition, for such power is essentially inherent in the very conception of law. . . . What the state is seeking to do is to vindicate and enforce its own law . . ."). Under this view, then, because the New York fair lending laws are not substantively pre-empted, he is not exercising "visitorial powers" by enforcing them.

Respondents counter that the holding of *St. Louis* is not so broad. In their view, the Court held only that a State may enforce its laws against a national bank when federal law grants the bank no authority to engage in the underlying activity at issue. See Brief for Respondent Clearing House Association 33–34. Here, federal law expressly authorizes national banks to make mortgage loans. See 12 U. S. C. §371(a). Thus, unlike in *St. Louis*—in which the relevant state-law-proscribed conduct in a category that was wholly beyond the powers granted to national banks—petitioner seeks to superintend the manner in which the national banks engage in activity expressly authorized by federal law. According to respondents, then, §484(a)'s ban on unauthorized visitation provides the "controlling reason" forbidding state enforcement that was absent from *St. Louis*, see 263 U. S., at 660.

There is no need to decide which party has the better argument. The *St. Louis* decision nowhere references §484(a) or addresses "visitorial powers." Thus, as noted above, even if the decision is best read to support petitioner's view of the statute, that conclusion is insufficient to deny *Chevron* deference to OCC's construction of §484(a). "Since *Chevron* teaches that a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative, the agency's decision to construe that statute differently from a court does not say that the court's holding was legally

wrong. Instead, the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes." *Brand X*, 545 U. S., at 983. A judicial decision that fails to directly confront the provision at issue cannot be deemed to have adopted the "authoritative" construction of the statute.[3] Petitioner's reliance on other decisions of this Court is misplaced for this very same reason. See *First Nat. Bank in Plant City* v. *Dickinson*, 396 U. S. 122 (1969); *Anderson Nat. Bank* v. *Luckett*, 321 U. S. 233 (1944); *First Nat. Bank of Bay City* v. *Fellows*, 244 U. S. 416 (1917); *Easton* v. *Iowa*, 188 U. S. 220 (1903); *Waite* v. *Dowley*, 94 U. S. 527 (1877); *National Bank* v. *Commonwealth*, 9 Wall. 353 (1870). None of these decisions addressed the meaning of "visitorial powers" for purposes of §484(a), let alone provided a definitive construction of the statute.

Finally, this Court's decision in *Watters* v. *Wachovia Bank, N. A.*, 550 U. S. 1 (2007), supports OCC's construction of the statute. *Watters* addressed whether the NBA

---

[3] The majority's suggestion that the Court's decision in *First Nat. Bank in St. Louis* v. *Missouri,* 263 U. S. 640 (1924), is not "authoritative" falls short of the mark. See *ante*, at 6, n. 2; see, *e.g.*, *ante*, at 7–8 ("[R]eading 'visitorial powers' as limiting only sovereign oversight and supervision would produce an entirely commonplace result—the precise result contemplated by our opinion in *St. Louis*"). According to the majority, irrespective of which party has the better reading of that case, it "would still stand for the proposition that the exclusive federal power of visitation does not prevent States from enforcing their law." *Ante*, at 6, n. 2. But that conclusion rests on the assumption that the *St. Louis* Court shared the majority's conception of law enforcement and visitation as categorically distinct for purposes of §484(a). It is impossible to verify that assumption, however, because the bank never raised the "visitorial powers" defense in that case. See Reply Brief for Petitioner 6. If the *Chevron* doctrine is to have any interpretative value, an agency's construction of a statute cannot be foreclosed by a prior judicial decision in which the provision in question was neither raised by the parties nor passed upon by the court.

pre-empted the application of certain Michigan laws to the mortgage-lending activities of an operating subsidiary of a national bank. See *id.,* at 7–8. In deciding that issue, the Court did not reach the question presented here. But the Court was fully aware that the Michigan statutes granted state banking commissioners the very enforcement authority that petitioner seeks to exert over the national banks in this case. See *id.*, at 9–10 (citing Mich. Comp. Laws Ann. §§445.1661 (West 2002), 493.56b (West Supp. 2005)); see also 550 U. S., at 34 (STEVENS, J., dissenting) (describing §§445.1661 and 493.56b as "state visitorial oversight").[4]

As the Court explained, although "the Michigan provisions at issue exempt[ed] national banks from coverage . . . [t]his [was] not simply a matter of the Michigan Legislature's grace. For, as the parties recognize, the NBA would have preemptive force, *i.e.*, it would spare a national bank from state controls of the kind here involved." 550 U. S., at 13 (citations omitted); see *ibid.* (explaining that "real estate lending, when conducted by a national bank, is immune from state visitorial control"). The Court's conclusion in *Watters* that §484(a) deprives the States of inspection and enforcement authority over the mortgage-lending practices of national banks lends weight to the

—————

[4]The majority contends that *Watters* is "fully in accord with the well established distinction between supervision and law enforcement." *Ante*, at 6. But this argument ignores the reach of the statutes that the Court assumed were visitorial in *Watters*. The Michigan laws at issue in *Watters* allowed for much more than "'general supervision and control'" of the operating subsidiaries of national banks. *Ante,* at 6. They also included provisions permitting the state attorney general to "take any appropriate legal action to enjoin the operation of the business" and allowing the commissioner "[t]o bring an action in . . . circuit court in the name and on behalf of this state" to enjoin "any unsafe or injurious practice or act in violation of this act or a rule promulgated under this act." Mich. Comp. Laws Ann. §§445.1661(e) (West 2002); 493.56b (West Supp. 2005).

agency's construction of the statute.

## II

Petitioner also argues that three different background principles trigger a clear-statement rule that overcomes any *Chevron* deference to which OCC's construction of §484 otherwise might be entitled. I disagree. None of petitioner's arguments provide a doctrinal basis for refusing to defer to the agency's reasonable construction of this statute.

First, petitioner contends that OCC's regulation, which interprets §484(a) to pre-empt state enforcement of state law but not the substantive state law itself, undermines important federalism principles and therefore triggers a requirement that Congress clearly state its pre-emptive intentions, see *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991) ("[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute" (internal quotation marks omitted; alteration in original)). Petitioner is incorrect because OCC's construction of the statute does not alter the balance of power established by the Constitution.

National banks are created by federal statute and therefore are subject to full congressional control. The States "can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit." *Farmers' and Mechanics' Nat. Bank* v. *Dearing*, 91 U. S. 29, 34 (1875); see also *Watters*, 550 U. S., at 10 ("Nearly 200 years ago, in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), this Court held federal law supreme over state law with respect to national banking"). As a result, the only question presented by this case is whether Congress has seen it "proper to permit" the States to enforce state fair lending laws against national banks. OCC's reasonable conclusion that §484(a) answers that

question in the negative does not alter the federal-state balance; it simply preserves for OCC the oversight responsibilities assigned to it by Congress. See *id.*, at 22 ("Regulation of national bank operations is a prerogative of Congress under the Commerce and Necessary and Proper Clauses. The Tenth Amendment, therefore, is not implicated here" (citation omitted)).

Second, petitioner argues that a clear statement is required because "the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). There should be no presumption against pre-emption because Congress has expressly pre-empted state law in this case. See *Altria Group, Inc.* v. *Good*, 555 U. S. \_\_\_, \_\_\_ (2008) (THOMAS, J., dissenting) (slip op., at 9) ("[T]he presumption against pre-emption 'dissolves once there is conclusive evidence of intent to pre-empt in the express words of the statute itself'" (quoting *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 545 (1992) (SCALIA, J., concurring in judgment in part and dissenting in part)); see, *e.g.*, *Riegel* v. *Medtronic, Inc.*, 552 U. S. \_\_\_, \_\_\_ (2008) (slip op., at 2) (construing the express pre-emption provision of the Medical Device Amendments of 1976, 21 U. S. C. §360c *et seq.*, without any reliance on the presumption against pre-emption).

In any event, this presumption is "not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States* v. *Locke*, 529 U. S. 89, 108 (2000). National banking is the paradigmatic example "In defining the pre-emptive scope of statutes and regulations granting a power to national banks," this Court has taken the firm view that "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Barnett Bank of Marion Cty., N. A.* v. *Nel-*

*son*, 517 U. S. 25, 33 (1996). As a result, federal legislation concerning national banks is "not normally limited by, but rather ordinarily pre-empt[s], contrary state law." *Id.*, at 32. As with general maritime law, Congress' "legislat[ion] in th[is] field from the earliest days of the Republic" and its creation of an "extensive federal statutory and regulatory scheme" means that an "'assumption' of non-pre-emption is not triggered." *Locke, supra*, at 108. That the States may also have legislated alongside Congress in this area, see *ante*, at 12–13, does not alter this conclusion, see*, e.g., Franklin Nat. Bank of Franklin Square* v. *New York*, 347 U. S. 373 (1954).

Last, petitioner argues that *Chevron* deference is inapplicable because OCC's regulation declares the pre-emptive scope of the NBA. And, the majority flatly asserts that "[i]f that is not pre-emption, nothing is." *Ante*, at 13. But OCC did not declare the pre-emptive scope of the statute; rather, it interpreted the term "visitorial powers" to encompass state enforcement of state fair lending laws. The pre-emption of state enforcement authority to which petitioner objects thus follows from the statute itself—not agency action. See *Smiley*, 517 U. S., at 744 ("This argument confuses the question of the substantive (as opposed to pre-emptive) *meaning* of a statute with the question of *whether* a statute is pre-emptive. We may assume (without deciding) that the latter question must always be decided *de novo* by the courts. That is *not* the question at issue here; there is no doubt that §85 pre-empts state law" (emphasis in original)).

Here, Congress—not the agency—has decided that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law." 12 U. S. C. §484(a). Indeed, the majority agrees that it is the "statutory term"—and not OCC's regulation—that "define[s] and thereby limit[s] the category of action reserved to the Federal Government and forbidden to the States." *Ante*,

at 13. As a result, OCC has simply interpreted that term to encompass petitioner's decision to demand national bank records and threaten judicial enforcement of New York fair lending laws as a means of obtaining them. As *Smiley* showed, a federal agency's construction of an ambiguous statutory term may clarify the pre-emptive scope of enacted federal law, but that fact alone does not mean that it is the agency, rather than Congress, that has effected the pre-emption.

Petitioner's federalism-based objections to *Chevron* deference ultimately turn on a single proposition: It is doubtful that Congress pre-empted state enforcement of state laws but not the underlying state laws themselves. But it is not this Court's task to decide whether the statutory scheme established by Congress is unusual or even "[b]izarre." See *ante*, at 7. The Court must decide only whether the construction adopted by the agency is unambiguously foreclosed by the statute's text. Here, the text, structure, and history of "visitorial powers" support the agency's reasonable interpretation of §484. Petitioner has not identified any constitutional principle that would require Congress to take the greater step of pre-empting all enforcement of state lending laws (including private enforcement) even though its central concern was the allocation of the right to exercise public visitation over national bank activities.

\*    \*    \*

For all these reasons, I would affirm the judgment of the Court of Appeals.